## THE CHEROKEE.*

*(District Court, S. D. Ohio. W. D.  January 30, 1883.)*

1. COLLISION—ENTERING NARROW CHANNEL—PILOT RULE 3.

   The question of negligence, where a vessel enters a narrow channel while another is aground on its banks, depends on the apparent situation and circumstances of the vessel aground, making proper allowances for a change in the relative situation of the vessel aground; but unexpected changes, not brought about by the vessel attempting to pass, should not be considered in determining whether there has been any blame.  Where, *therefore*, pilot rule No. 3 requires an ascending vessel, about to enter a narrow channel at the same time with a descending vessel, to lie below the channel until the descending vessel has passed through, she may, without negligence, enter the channel, if the descending vessel, being a tow-boat with barges in tow, has grounded one of the barges, and is not coming on, and there be room to pass without collision; and the unexpected drifting of one of the barges, by which a collision occurs, is an inevitable accident, for which the ascending vessel is not liable.

2. SAME—TUG AND TOW.

   A tow-boat working at one of its barges aground should, if possible, make way by temporarily suspending work to permit another vessel to pass, where that is necessary to prevent delay.

3. SAME—BARGE ADRIFT.

   Where a barge, constituting part of a tow, is adrift in a narrow channel, a passing steam-boat owes the duty of doing all that is possible to prevent collision with it; but if she reverses her engines as speedily as possible, and otherwise does all she can, there can be no blame, because she is in a narrow channel, where the tug and tow would have had the right of way if it had not been partially aground.

In Admiralty.

*Lincoln, Stevens & Slattery*, for libelants.

*Hoadly, Johnson & Colston*, for claimants.

HAMMOND, J., *(sitting by designation.)*  Notwithstanding the voluminous testimony in this case the essential facts lie within a small compass.  There is opposite Rising Sun, on the Ohio river, a very narrow channel, caused by the encroachment of a bar, making out from the Kentucky shore, and at the stage of water existing at the time of the collision sued for, navigation at the place was difficult.  It is conceded that this place comes within the application of the following rule, prescribed for the government of pilots:

"Rule 3.  Where two boats are about to enter a narrow channel at the same time, the ascending boat shall be stopped below such channel until the descending boat shall have passed through it; but should two boats unavoidably meet in such channel, then it shall be the duty of the pilot of the descending boat to make the proper signals, and, when answered, the ascend-

*Reported by J. C. Harper, Esq., of the Cincinnati bar.

ing boat shall lie as close as possible to the side of the channel the exchange of signals may have determined, as allowed by rule 1, and either stop the engines or move them so as only to give the boat steerage way, and the pilot of the descending boat shall cause his boat to be worked slowly until he has passed the ascending boat."

The tow-boat Lane, while descending the river with barges in tow, four heavily laden, and one, a fuel supply barge, was endeavoring to enter this narrow channel, and when about the head of it one of the barges in the lead grounded on the edge of the bar. She at first attempted to force the tow forward, but not succeeding began to swing with the barges still afloat down stream, but out of the channel and over the bar, loosening the lashings of the three rear barges, until she and they became detached from the other two. Fearing that the force of the current would tear out the head-pieces of the other two barges, the captain of the Lane directed the ratchets, fastening the grounded barge and its companion leader to the starboard, to be knocked off, supposing that the lashings of the cable would hold it fast, but give sufficient play to prevent the tearing out of the head-pieces. These cable lashings parted—according to the testimony of the people on the Lane—by force of the strain of the current, and the starboard leader barge left the grounded barge and started down this narrow channel, coming in collision with the steam-boat Cherokee, by which it and its cargo of coal became a total loss, for which loss this suit is brought by the owners respectively of the barge and coal against the Cherokee. The negligence imputed by the libel is a violation of the above-quoted pilot rule, and the customs of navigation, by being in the channel at all, and a want of proper care in avoiding the collision after the barge was adrift.

The proof establishes, in my judgment, in regard to the movements of the Cherokee, these facts: The Cherokee, ascending the river, was at the foot of the channel about the time the barge of the Lane grounded, and, observing the Lane, blew one whistle, as the rule then required, to know of the Lane by her answering signal on which side of the channel she would come out, to which signal there was no response. She also stopped, except for steerage way, close in under the bar and at the foot of the channel, as required by the above-mentioned rule, for a space of about five minutes. Hearing no response to her signal, and observing that the Lane made no progress, the conclusion was that she was aground; and it appearing that there was room to pass through the channel the Cherokee proceeded up the river, had passed the stern of the Lane, and was about mid-

ship of that vessel, when she came in violent collision with the barge that was adrift as before mentioned. There was in fact room between the shore and the grounded barge, and would have been room between the shore and both the grounded barge and its mate, if the latter had remained fastened to the grounded barge, for the Cherokee to pass them, narrow as the channel was at that place. There is a good deal of conflict as to the distance, and the capacity of the Cherokee to have avoided the barge adrift by retreating; but taking the situation of the witnesses, and their means of observation into consideration, it must be determined, I think, that the Cherokee acted as promptly as she could in that respect; she was going slowly and cautiously, and all agree she had reversed her engines, and her wheel was moving back at the moment of the collision. The libelant's witnesses think she did not move back soon enough, and had not conquered her headway when the collision occurred, nor made more than one or two revolutions backward, while her own people say she had not only stopped her headway, but was actually moving back when the collision occurred. Her own officers were in the best position to know this fact, and, other things being equal, their testimony is to prevail over that of observers from the shore or on the Lane and her barges. *The Milwaukee*, Brown, Adm. 313. Besides, the burden of proof is on the libelant, and when there is a reasonable doubt of any blame the loss must be sustained where it has fallen. *The Grace Girdler*, 7 Wall. 196; *The City of London*, Swab. 300, 302.

It does not seem to me that the proof makes out any negligence on the part of the Cherokee as far as relates to her efforts to avoid a collision after the barge was adrift. The difference between the witnesses on this point arose out of a divergence of estimates of time and distance, and, I think, all things considered, the very decided preponderance of the known facts is in favor of the shortest time and the shortest distance between the breaking loose of the barge and the collision; and this fact, also, makes it clear to my mind that the Cherokee was proceeding very slowly and cautiously, for if she had not been, she could not have checked her speed and reversed her engines, as even the libelant's witnesses describe, in so short a time as there must have been between the breaking loose of the barge and the actual contact with the steam-boat.

Was the Cherokee negligent, and is she to be blamed for being in the channel? I think not. I do not see how she can be benefited by the circumstance that there was no response to her signal, except that it may have confirmed, however unreasonably, her pilot's judg-

ment that the Lane was aground. If the Lane had not been aground, as a fact, a want of response would not·have justified the Cherokee in proceeding, because rule 2 clearly required her to give several short, quick sounds of the whistle, lest her other signal had not been heard or had been misunderstood, and if the Lane had been coming down and this collision occurred with her or her barges attached, I do not see how the Cherokee could be released from blame. But no matter upon what erroneous inferences the pilot of the Cherokee acted in coming to a conclusion that the Lane was aground, she was aground, as a fact, or one of her barges was, and she engaged in the business of overcoming that difficulty, which is the same thing, and there was apparently room for the Cherokee to pass through the channel. Indeed, it was not obstructed, for the Lane and her other barges were over the bar, and quite, if not entirely, out of the channel, while the grounded barge and its mate were lying on the extreme edge of the channel,—one on the bar and the other not obstructing the channel, if in it at all. Under these circumstances I cannot think the Cherokee was compelled to lie by at the foot of the channel until the Lane could gather up her tow and pass down the channel. It took her all day to lighten off the grounded barge, get her tow in hand, and proceed on her voyage. It is true, she gathered up her barges still afloat and passed them down this channel very soon after the Cherokee went up, but she was not executing that maneuver at the time the Cherokee entered the channel, and was in no condition to do it; she was somewhat helpless and was detaching her tow, or it was being broken up by the force of the current and was floating over the bar and out of the channel.

The question of fault where a vessel enters a narrow channel, while another is aground on its banks depends upon the apparent situation and circumstances of the vessel aground, making proper allowances for a change in the relative situation of the vessel aground. If it seems reasonably safe to attempt the passage, the then situation only is to be taken into account, and not the unexpected changes which occur while making the attempt. *The Thomas A. Scott*, Brown, Adm. 503. Now, the Lane's own people expected the cable lashings to hold the barge that went adrift fast to the grounded barge. According to their own theory, they loosed the iron ratchets to prevent pulling out the head-pieces, and expected the ropes to hold this barge fast to the grounded barge until the Lane could manage to do whatever was required to get out of the difficulty. If they relied on this, it was not unreasonable for the Cherokee to rely on it; and if both

had not been disappointed no accident would have occurred, for there would have been ample room for the Cherokee to pass. The Cherokee's witnesses say the lashings were imprudently cut with an ax, but the Lane's people deny this, and they knew most about it. But it is wholly immaterial how it was done; there was no intention to set the barge adrift, and it was this unexpected incident that caused the collision. The barge, unattached, had no right of way to the channel. It was only the Lane and her tow in navigable condition, already in the channel, that had the right of way.

The drifting of the barge changed the situation, and it is not with reference to that change the Cherokee must be judged. If the situation had remained as it was when she entered the channel, she could have passed, and had a right to pass. She did not change the attitude of the barge, nor contribute to any change. She had no right to run down the barge, or collide with it, if she could avoid it; and, if the barge had been coming through the channel before the Cherokee entered it, with not sufficient room for both, she would have been compelled to wait till the barge came through. But that was not the case. The barge was supposed by all hands to be securely attached to the grounded barge, and in that condition there was no danger of collision, and it is by that situation the conduct of the Cherokee is to be tested. If she had remained out of the channel a few minutes longer, there might have been no accident, and the floating barge might have acquired a right of way to the channel; but that is not, obviously, the true criterion of her conduct. With relation to the Lane, the Cherokee had no duty she did not perform. She gave the proper signals, and although she had no right to proceed, if the Lane had been coming on, without invoking a response by compliance with rule 2, and sounding several whistles, it is sufficient to say the Lane was not coming on, and at the time the Cherokee entered the channel had no intention of coming on. Indeed, if the Lane may be treated as a vessel working at another vessel aground—and I do not see why she may not be so treated—it was her duty, where that was possible, to have made way, if necessary, for the Cherokee; to temporarily have suspended her work and cleared the channel, that she might pass. *The Napoleon,* Brown, Adm. 32; *The Thomas A. Scott, supra.*

In any view that it is proper to take, it seems to have been an inevitable accident, for which the Cherokee, certainly, was not to blame, unless she was compelled to await all the delay incident to the trouble in which the Lane found herself. The Cherokee did not

run down or impede a crippled vessel; she simply tried to pass her, under circumstances supposed to be safe, and which were safe but for an unexpected change in the situation, for which she was not responsible.

Dismiss the libel.