### THE LONGFELLOW.

(Circuit Court of Appeals, Sixth Circuit. October 2, 1900.)

#### No. 724.

1. SHIPPING—SINKING OF VESSEL—LIMITATION OF OWNER'S LIABILITY.

The Longfellow, a large river steamer, carrying passengers and freight between Cincinnati and New Orleans, on leaving Cincinnati at a time when the water was high and the current swift struck against the stone pier of a railroad bridge, and was broken in two and sunk, with the loss of her cargo and some of her passengers and crew. The owners had held her a day to await the clearing up of a fog; had provided her with competent officers, crew, and pilot, and with a powerful tug to aid her in passing the bridges at the city. *Held*, that faults in her navigation producing the collision could not be imputed to her owners, as having occurred through their "privity or knowledge," within Rev. St. § 4283, so as to prevent the limitation of their liability under said section to the value of the vessel and her pending freight.

2. SAME—EVIDENCE OF SEAWORTHINESS.

Where all the direct evidence was to the effect that a steamer was seaworthy when she entered on her voyage. it cannot be inferred from the fact that a short time before she had met with two accidents, in one of which she was slightly injured, that her seaworthiness was thereby im-

paired, in the absence of affirmative evidence that she was in fact injured thereby in her hull or machinery.

**3.** SAME—CARRIAGE OF PASSENGERS—DUTY OF INSPECTION.

Where a steamship had a portion of her guards torn away by a collision with a bridge pier, but an examination by competent men disclosed no injury to her hull or machinery, and only slight repairs were necessary, and she had been regularly inspected and pronounced stanch and seaworthy only three months before, the fact that no reinspection was applied for after the accident does not constitute a failure to comply with Rev. St. § 4417, regarding inspection, which will render her owners liable for injuries to passengers or their effects under section 4493, creating such liability, where they have failed to comply with any of the provisions of that title, when it is not shown that any injury in fact resulted which impaired the strength or safety of the vessel.

**4.** ADMIRALTY—SUIT FOR LIMITATION OF LIABILITY—COSTS.

Where the owners of a vessel, in proceedings instituted by them for a limitation of their liability on account of the sinking of the vessel, deny any negligence or any liability, as they are permitted to do by admiralty rule 56, and that issue is decided against them, they may properly be taxed with the costs arising on such issue.

Appeal from the District Court of the United States for the Western Division of the Southern District of Ohio.

In Admiralty. The steamboat Longfellow, while on a voyage from Cincinnati to New Orleans, came into collision with a stone pier of the Chesapeake & Ohio Railroad bridge which crosses the Ohio river at Cincinnati, and was instantly sunk. The boat and her cargo were almost a total loss, the appraised value of the wreck being only $250. Several passengers, the chief clerk, and one or more of her crew lost their lives. The Longfellow was a first-class passenger steamboat plying on the Mississippi and Ohio rivers. She was constructed in 1875, and in 1893 was, to a large extent, reconstructed. She was then lengthened by the addition of a section of 30 feet about her middle. After this reconstruction and overhauling her length was 279 feet and her beam 42 feet. Her tonnage was 1,178. She was due to leave Cincinnati on the evening of March 7, 1895, but on account of fog did not leave port until about 6:40 a. m. March 8th, at which time the fog had disappeared. The river was high,—about 38 feet. To proceed down the river, she had to pass under three of the five railroad bridges crossing the Ohio at Cincinnati. At such a stage of water the current is very great, being from five to eight miles under these bridges. The evidence shows that the Chesapeake & Ohio bridge adds much to the perils of navigation, and that in high water there is a cross current which makes the most southerly of its piers an object much dreaded by navigators. In view of the stage of water, and the danger of passing the bridge, the managing officers of the corporation owning the Longfellow arranged that she should be assisted through the bridges by the Hercules Carrol, a towboat of much power, having a length of 172 feet. The Longfellow was directed not to go out until the fog cleared, and the Carrol was ordered to lie by her until she should start, and give such assistance as should be desired, both in turning and in going under the bridges. At 6:40 a. m., the fog having cleared, the Longfellow left port, and proceeded up the river, and towards the Kentucky side of the river, to secure ample room to turn in. There the Hercules Carrol came alongside, and was made fast on her starboard side, about midship. The turn was easily made, and the voyage down the river begun, the Carrol remaining alongside. The stage of the water was such as to compel the lowering of the smokestacks in order to pass under the bridges. To facilitate this, the stacks were hinged at about the height of the pilot house, so that they could be lowered out of the way of the bridges. This was done when the voyage down commenced. The pilot house was about 100 feet from the bow. The smokestacks were from 30 to 50 feet in front of the pilot house. The master was at his proper post, on the hurricane deck, about 75 feet in front of the pilot house. The suspension bridge was passed safely, though, while passing, the smoke from her stacks for a time obscured the outlook of the pilot from the pilot house. The rail-

road bridge was from 2,000 to 2,400 feet below the suspension bridge, and when the suspension bridge had been passed the pilot's vision became for a moment clear enough for him to see that he was headed for the middle of the channel span of the railroad bridge. Very shortly after this his view became again obscured, and almost simultaneously the boat took a sudden sheer to port. The pilot says he at once shouted to the captain, who was standing forward on the hurricane deck, "I cannot see a thing;" that he heard no answer, and repeated it, when the captain answered, "You are headed down to the left of the pier." He also says that somebody at the same time hollered, "Stop her!" "Back her!" The other evidence shows that this was said by the master. The first impulse of the pilot under the circumstances was to keep his speed and pass to the left of the pier, between it and the Kentucky shore. He therefore did not at once stop or reverse, but tried to make for the Kentucky shore, but in a moment he rang the bell to stop and then to reverse. He was too close. The bow passed the pier, but the boat struck the pier about midship of her starboard side. For a moment she seemed "to hang," as described by the witnesses, against the side of the pier, and then broke in two. The cabin and deck freight slid into the river, and with it several of the passengers and crew. The great majority, however, jumped over to the Carrol, which had cut loose but was close to the Longfellow's bow, and were saved. The smoke did not affect the view of the master at any time, as he was forward the stacks. Neither did he at any time notice its effect at the pilot house, or on the vision of the pilot. He says he did not hear the pilot shout that he could not see. The master also says that after passing the suspension bridge, and when within about 600 feet above the railroad bridge, the Longfellow took a sudden sheer, so as to head for the pier nearest the Kentucky shore; that he at once shouted to the pilot: "You are headed to the pier. Stop her and back her;" and that he later called to the Carrol to stop and to back. There is some conflict between the evidence of the different witnesses as to what was said by the pilot and the captain, and as to just when and who called to stop and back. This conflict need not now be regarded, as it will be referred to in dealing with another aspect of the case. In accordance with section 4283. Rev. St. U. S., and the practice thereunder as laid down in rules 54, 55, and 56 of the rules in admiralty, the owners of the steamer Longfellow filed a petition in the district court to obtain the limitation of liability conferred by the statute. For this purpose they averred that the loss and damage done or occasioned was without their "privity or knowledge." They also denied all legal liability, averring that the Longfellow was seaworthy, stanch, fully equipped, and having a full and experienced force of officers and men, and that the collision was not due to any negligence in navigation whatever. A monition issued. All persons interested or having claims were enjoined from suing, and required to set up their claims in the suit thus started. A large number of claims were presented by answers and cross libels. These cross libels were sustained to the extent of more than $60,000, but the district court held that the owners were not liable beyond the value of the vessel and freight earned. No freight had been earned. The value of the wreck was appraised at $250. The decree was that the owners pay this sum into court, and also enough to pay all costs, except the cost of depositions taken by cross libelants in support of their issues, and that the cost of such depositions be paid out of the fund, and the remainder distributed pro rata among those who had established losses.

R. B. Bowler, Joseph Wilby, and Oscar M. Gottschall, for appellants.

W. H. Jones, for appellee.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

The appellants are numerous. They may be divided into two classes: First, those who prefer claims for cargo lost; second, claims

preferred by passengers for loss of baggage, or by the representatives of passengers who lost their lives. The limitation of liability afforded by section 4283 applies to the claims of both classes of appellants, subject to the modifications in favor of passengers made by sections 4487 and 4493 of the Revised Statutes. Butler v. Steamship Co., 130 U. S. 527, 9 Sup. Ct. 612, 32 L. Ed. 1017. The bearing and effect of these modifications will be considered hereafter.

1. Section 4283 of the Revised Statutes reads as follows:

"The liability of the owner of any vessel, for any embezzlement, loss, or destruction, by any person, of any property, goods or merchandise, shipped or put on board of such vessel, or for any loss, damage, forfeiture, done, occasioned, or incurred, without the privity, or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

The material question arising here is whether the loss of the Longfellow occurred "without the privity or knowledge" of her owners. Under the common as well as the civil law, a shipowner was personally liable to the full extent of any loss or damage resulting from the fault or wrongful conduct of the master or crew. In the interest of commerce, the maritime law of modern Europe limited his liability, if free from personal fault, to the extent of the value of his interest in the ship and her pending freight. The history of this limitation of liability is so fully and luminously stated by Justice Bradley in Transportation Co. v. Wright, 13 Wall. 104, 20 L. Ed. 585, and the subsequent case of The City of Norwich, 118 U. S. 468, 6 Sup. Ct. 1150, 30 L. Ed. 134, as to make it only necessary to refer to those opinions. The section of the Revised Statutes set out is from an act passed by the congress in 1851, and its clear purpose was to place the shipping of the United States upon a footing similar to that of European competitors. To this end the act has been liberally construed in aid of the object and purposes of congress. Unless, therefore, the loss of the Longfellow was with the "privity or knowledge" of the owners, they are not to be held liable beyond the value of the vessel after the termination of the voyage and her pending freight. The petition of the corporate owner avers that the loss of the steamer arose through a peril of the river, without any negligence or fault, or that, if there was negligence or fault, it was that of the master or pilot, and was not such personal negligence or fault as to make the owners liable beyond the value of the vessel and her freight. They aver that due diligence was used to make the steamer seaworthy, and that in fact she was so. The answer and cross libels deny that the loss was by a peril of the river, or that it was without negligence, and aver that it was the result of the negligence of both the owners and of those in charge of her navigation. They deny that the Longfellow was seaworthy when her voyage began, and aver that she was badly loaded and overloaded, badly equipped, and improperly manned. A great amount of evidence was taken upon the issues thus made up, with the usual conflicts in respect to the occurrences immediately connected with the collision and loss of the boat, but no more than might be anticipated, considering the excitement, alarm, and interest of those who were spectators. The learned district judge reached the

conclusion that the steamer was seaworthy, that she was properly equipped and manned, and that she was neither overladen nor improperly laden. He further reached the conclusion that her loss was due to faults of navigation. These faults of navigation he found were without the knowledge or privity of the owners, who were therefore exonerated from liability beyond the value of the wreck and freight. The errors assigned by the appellants who were cross libelants do not open up the decree so far as it was found that there was faulty navigation, but are confined to that part of the decree which limited the liability of the owners. The only error assigned by the corporate owners of the steamer, the cross appellant, is as to the decree for costs. It follows that we must, for the purposes of this appeal, assume that there was faulty navigation, and confine our review to the question as to whether the loss and damage was without the "privity and knowledge" of the owners.

The faults which the trial judge found were clearly faults in the navigation of the Longfellow, and cannot be imputed to her owners, as having occurred through their "privity or knowledge." If we assume that there was no such positive prearrangement between the officers of the Longfellow and the Hercules Carrol as would secure the best co-operative results, it was the fault of those navigating those boats, and not of the owners of the Longfellow. The owners procured the Hercules Carrol to aid in passing under the bridges. She was directed to assist, and was there for that purpose. The navigation of the Longfellow was under the sole control and direction of her pilot, who was a licensed pilot of unquestioned reputation and skill. It was for him to direct how the Hercules Carrol should assist, and the latter was subject to his orders and direction so far as the actual navigation of the Longfellow was affected. Indeed, it is difficult to understand how the owners could do more than they did. They obtained the services of the towboat, but could not well foresee just how, in the exigencies of navigation, her movements could be directed in advance. The navigation of the towboat when lashed alongside of the Longfellow was necessarily to be governed by the navigation of the latter, and it was for the pilot to give such special orders as his judgment and the circumstances dictated. Neither was it the personal fault of the owners that the navigators of the Longfellow did not stop and back when smoke first obscured her pilot's view If there was fault, it was a fault of those controlling her navigation, and was without the knowledge or privity of the owners. It is enough in respect to the lading of the steamer to say that there is no satisfactory evidence that she was overladen, or that there was any fault in stowing the character of freight shown to have been stowed upon her upper or hurricane deck. It has been argued that she was unseaworthy. True, she was a boat of some age. She was built in 1875, but she was reconstructed in 1893, and 30 feet added to her length. There is no tangible evidence that this addition rendered her structurally so weak as to be unseaworthy. The work was done by reputable constructors and shipbuilders, who testify that she was stanch and strong when thus overhauled and reconstructed. After that addition to her length, she made many voyages without de-

veloping any defects, and there is no material evidence which tends to contradict the positive evidence as to her general stanchness and seaworthiness. Appellants say that the fact that there was but little jar when she struck the bridge pier, and that she went to pieces so rapidly, is evidence of her rottenness, or of structural weakness amounting to unseaworthiness. That her important timbers were not rotten, but sound, is too clearly shown to be worthy of serious argument. Nor is the fact that no great jar was observable of great weight as evidence of unseaworthiness. When she struck she had not fully lost her headway and the current was carrying her down at from five to eight miles per hour. She struck amidship, and not bow first, and the object she struck was a solid stone pier, presenting an edge like the bow of a ship. The jar would doubtless have been greater had she hit bow on, or hit a yielding object like a boat or even a wooden dock. Striking on her starboard side about amidship, the first effect of the blow and the current seems to have been to "hang her" against the side of the pier. Her bow and stern, insufficiently supported, would tend strongly to produce a break in the middle of a steamer having her length. But it is said that a month prior to this she had collided with the same pier, and had not been thereafter officially inspected. The evidence shows that upon that occasion her starboard guard was struck and partly torn away. That collision occurred at night. The boat was landed, and the next morning an examination was made by Capt. Laidley, an experienced master, and president of the company owning the boat, and by the superintendent of repairs. No injury, except to the guard, was discovered, and the boat was ordered to continue her trip, the repairs being made en voyage. On her way back from New Orleans she grounded near Paducah, and was pulled off by aid of another boat. There is positively no evidence whatever showing that either this previous collision or this grounding had in fact affected the seaworthiness of this boat. It is strange that, if her hull was injured by either, some tangible evidence had not before appeared, or been shown in the proof. The grounding of a steamer navigating the Mississippi and Ohio is a matter of common occurrence, and the consequences to be apprehended are not at all like those following from a ship at sea striking a reef, or even going on a bar. Assuming that the general burden is upon the owners to show seaworthiness, where the evidence of the fact is such as to be peculiarly within their knowledge or control, we think that burden has been met. In view of the entire evidence touching the condition of this steamer when she left port, we do not think the court would be authorized to infer that the seaworthiness of this steamer was seriously impaired by the two accidents preceding her final voyage, in the absence of some affirmative evidence that her hull or machinery were in fact injured by reason thereof. We quite agree with the court below in the conclusion that this boat was seaworthy, in view of the voyage she was to make.

2. In behalf of those appellants whose claims arose out of the loss of life of passengers, it is argued that the master, after being admonished by the pilot that the further navigation of the vessel was unsafe, in consequence of the interference of smoke with his view, elected to

pursue the voyage, and thereby made the owners answerable for all damages which should occur to any passenger or his baggage. This contention is based on section 4487, Rev. St., which is in these words:

"On any steamer navigating rivers only, when, from darkness, fog, or other cause, the pilot or watch shall be of opinion that the navigation is unsafe, or, from accident to or derangement of the machinery of the boat, the chief engineer shall be of the opinion that the further navigation of the vessel is unsafe, the vessel shall be brought to anchor, or moored as soon as it can prudently be done: provided, that if the person in command shall, after being so admonished by either of such officers, elect to pursue such voyage, he may do the same; but in such case both he and the owners of such steamer shall be answerable for all damages which shall arise to the person of any passenger, or his baggage, from such causes in so pursuing the voyage, and no degree of care or diligence shall in such case be held to justify or excuse the person in command, or the owners."

Appellants rely upon the evidence of G. O. Woods and Mrs. Woods, his wife, and that of a Miss Dalrymple, who were passengers, who say that they were in the pilot house when the boat started, and remained there until just before she struck the pier. These witnesses say that while passing under the suspension bridge the smoke from the Longfellow obscured the pilot's outlook, and that he called to the captain, who was standing forward, on the hurricane deck: "Captain, I can't see anything for this smoke. Stop her;" and that the captain answered back: "Go ahead. You are all right." They also substantially agree in saying that when about halfway between the two bridges the pilot again called out, "Stop her, I say; I can't see anything for this smoke," and then rang the signal bell, and that the captain answered back: "Go ahead. You are all right. Go south of the pier." We pretermit the question as to whether the state of facts thus testified to would, under the circumstances which then existed, constitute the "admonition" referred to by the statute, or the "election" by the master to proceed with the voyage notwithstanding the admonition of the pilot. We are quite of opinion, from a careful consideration of the whole of the evidence, that the witnesses referred to have confused what was said by the pilot to the master with what was said by the master to him, and that the pilot never did call upon the master to stop or back the boat. The situation was one which admitted of no delay or discussion. If the danger was such as to be best avoided by stopping and backing, the means of doing so were wholly under the command of the pilot. The means of communicating with the engine room were in the pilot house, and the pilot was in control of the navigation of the steamer. To suppose that in such an emergency as existed, even when passing under the suspension bridge, the pilot would undertake to advise the master that the voyage could not be safely pursued, and that he must stop or back, savors of the absurd. It was an occasion for immediate action to meet a sudden and temporary emergency. That the pilot did shout that his view was obscured is true. He probably did so twice,—once when passing under the suspension bridge, and again when he was within 1,000 feet or less of the railroad bridge. But in neither instance did he call upon the master to stop the boat. He denies that he asked the master to stop, and in this he is substantially

supported by his partner, another pilot, who was in the pilot house with him, and by Capt. McKay, an old lake captain, who was a passenger, and also in the pilot house, as well as by all the circumstances of the case. The master says he did not hear the complaint about the smoke at all, but that when the boat suddenly sheered he shouted to the pilot that "he was headed for the pier, and to stop and back." This the pilot heard, but rightly decided that if he was so headed his best chance was to go ahead at full speed, and pass the pier on his starboard side. For an instant he held to this, then changed his mind, or saw he could not pass, rung the bell to stop and reverse, and also called on the Hercules Carrol to do likewise. This was too late. Indeed, on the evidence, we are disposed to think that, from the time he passed the suspension bridge, to stop and back was impracticable, and that the only chance the boat had was to keep her speed and steer for the middle of the span before the sheer, and after that to have steered for the Kentucky shore. Half the length of the boat passed the pier before striking. A few seconds more of time, and she would have cleared it. That time was probably lost in the vain effort to stop and back. It was, however, an emergency, and an error of judgment attributable to the emergency, for which no criticism is deserved. The witnesses upon whom appellants rely have doubtless confused the pilot's earlier call, "that he could not see for the smoke," with his later direction to the Hercules Carrol to stop and back. We do not think appellants have made any case under section 4487. There was no such admonition by the pilot, or election by the master to pursue the voyage, as is contemplated by the statute.

3. The next contention is that the owners are liable under section 4493, Rev. St. That section reads as follows:

"Whenever damage is sustained by any passenger or his baggage, from explosion, fire, collision, or other cause, the master and the owner of such vessel, or either of them, and the vessel shall be liable to each and every person so injured, to the full amount of damage if it happens through any neglect or failure to comply with the provisions of this title, or through known defects or imperfections of the steaming apparatus, or of the hull; and any person sustaining loss or injury through the carelessness, negligence, or willful misconduct of any master, mate, engineer, or pilot, or his neglect or refusal to obey the laws governing the navigation of such steamers, may sue such master, mate, engineer, or pilot and recover damages for any such injury caused by any such master, mate, engineer, or pilot."

One of the provisions of the title in which this section is found is that contained in section 4417, which provides that "the local inspector shall, once in every year at least, upon the application in writing of the master or owner, carefully inspect the hull of each steam vessel within their respective districts," etc. The last inspection of the Longfellow was made November 27, 1894,—less than four months preceding her loss; and a license was then issued, which recited that she was sound and stanch and fully equipped. The contention is that another official inspection should have been applied for in consequence of the collision and grounding which occurred after November 27, 1894. There is no evidence whatever tending to show that the hull of this steamer sustained any injury whatever as a consequence of either accident, and none which in any degree tends

to show that the force of the collision with the pier on March 8, 1895, was not the sole proximate cause of her loss and destruction. We have been referred to the case of The Anne Faxon, 21 C. C. A. 366, 75 Fed. 312, where the failure to have a boiler reinspected after extensive replacements and repairs was held to be a failure to comply with the provisions of title 52. The case is not parallel. To make it so, it should appear that substantial repairs had been made to the hull or machinery of the Longfellow subsequent to her last inspection. This is not the case. There is no evidence of injury to hull or machinery, and none of repairs to either. We think there is no evidence of failure to comply with any provision of title 52.

4. This brings us to the cross appeal of the Memphis & Cincinnati Packet Company, owners of the Longfellow. This appeal is solely from the decree taxing costs. The Packet Company in their petition denied all negligence and all liability, and thus put the respondents and cross libelants to the proof of negligence to entitle them to any decree whatever. This issue was decided against the owner. All other issues were decided in favor of the owners. The inference from admiralty rule 55 is that costs and expenses of a strict limitation of liability suit should be paid out of the proceeds of the vessel and her freight. But by rule 56 the owners are at liberty in such suit to contest the liability of the vessel and of themselves for the loss or damage independently of the limitation of liability claimed under said act. If the owners elect to make such an issue, it would seem right that they should pay the costs arising upon the issue, and that rule 55 would not preclude such a taxation. This was the practice approved by the circuit court of appeals of the First circuit in The H. F. Dimock, 23 C. C. A. 123, 77 Fed. 226. The trial court doubtless had this distinction in mind when it taxed appellants with a part of the costs. We are not disposed to inquire deeply into the exact propriety of the division made by the district court; for, when the matter in controversy upon an appeal is merely the costs, the appeal will not be considered. Fabric Co. v. Smith, 100 U. S. 110, 25 L. Ed. 547; Paper-Bag Cases, 105 U. S. 766, 26 L. Ed. 959. The decree will in all respects be affirmed. The appellants, Clayton and others, will pay all costs except the costs of the cross appellant, the packet company. The costs of that appeal will be paid by that company.