## THURLOW et al. v. UNITED STATES.

### (District Court, D. Massachusetts. February 4, 1924.)

### No. 2261.

1. **Collision ⚖️107—Naval vessel held in fault for collision with anchored vessel in fog.**

   A naval order, in force during the war, that unless absolutely necessary vessels, when out of the usual track of shipping and in areas where submarines or raiders might be met, should not slow down or sound signals during a fog, *held* not to excuse a naval vessel for proceeding in a fog in the path of coastwise shipping at a speed of 12 knots without giving fog signals, and such vessel *held* in fault for collision with a schooner anchored because of the fog.

2. **Collision ⚖️85—Negative evidence held not sufficient to overcome positive testimony that fog bell was rung on anchored schooner.**

   Testimony of those on board a steam vessel, which came in collision with an anchored schooner in a fog, that the fog bell of the schooner was not heard, *held* to create doubt, but not sufficient to overcome the positive testimony of all on the schooner that the bell was being rung.

In Admiralty. Suit by Lewis K. Thurlow and others against the United States. Decree for libelants.

Stephen R. Jones, of Boston, Mass., for plaintiffs.
Frederic S. Harvey, Asst. U. S. Atty., of Lowell, Mass.

MORTON, District Judge. This is a case of a collision in a fog between the navy collier Jupiter and the four-masted schooner Horatio G. Foss. The present suit is brought under a special act of

⚖️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Congress approved May 15, 1922 (chapter 191), and is to be determined, as stated in the act, "upon the same principle and measure of liability, with costs, as. in like cases in admiralty between private parties." 42 Stat. 1589. The collision occurred about 6:40 p. m. on May 18, 1918, on the high seas, at a point 15 or 18 miles southeast of Winter Quarters Shoal lightship. The facts as to it are but little in controversy and are as follows:

The Foss was bound down the coast in ballast. She ran into light weather and fog, lost her exact position,. and came to anchor. Her master testifies that he anchored because she was drifting inshore, and he considered it inadvisable to get in closer, lest he be caught on a lee shore, if an easterly storm came on. At the time of the collision the schooner was at anchor, tailing about east.

[1] The Jupiter was proceeding up the coast. On entering the fog, she neither reduced her speed, which was 12 knots, nor sounded any fog signals, unless she heard the fog signals of other vessels forward of her beam. She had heard such signals several times during the afternoon, and on each occasion had stopped her engines, sounded signals herself, and proceeded with caution until the danger of collision had passed.

The reason for her disregard of the requirements of the International Rules was that the war was then on, and her commander (Lieut. Commander Kelton) thought that enemy submarines might be operating on that part of the coast. He testified that about 10 days after this accident a steamer was in fact sunk by an enemy submarine .just about where it occurred. The naval orders directed that:

"During fog, when in areas in which submarines or raiders may be met, vessels *when out of the usual track of shipping* (italics mine) are not to slow down and are not to sound their sirens or whistles unless absolutely necessary."

Commanders of naval vessels were also expected to exercise a certain amount of discretion, and to take such measures, not in violation of orders, as in their judgment might be necessary from time to time for the safety of their vessels. Mr. Kelton testified that the Jupiter was proceeding in the usual track of vessels bound up and down the coast. The government charges as a fault against the Foss that she was anchored in the usual track of shipping.

The first knowledge the men on the schooner had of the presence of the Jupiter was when they heard the noise in the water which she made coming on. They immediately rang their fog bell vigorously. The first knowledge on the Jupiter of the presence of the Foss was when the Jupiter's bow lookout saw, and immediately reported, the Foss' sails almost dead ahead. The Jupiter's helm was at once put hard aport and her engines reversed. The vessels were only a short distance apart, and the Jupiter was unable to clear the Foss. She struck the schooner on the port quarter and cut off part of her stern. The injury fortunately did not extend below the water line, so the Foss kept afloat. The Jupiter stood by, anchoring near the Foss, until tugs were sent for and towed the schooner into port.

That the Jupiter was at fault for immoderate speed and failure to sound proper signals in a fog is clear, unless she was excused by the

circumstances under which she was proceeding. The English courts have held repeatedly that the war, the dangers to which it exposed shipping, and the official regulations passed to minimize those dangers, constituted special circumstances under rule 27, and justified the nonobservance of all other rules (The Purfleet Belle [1918] Prob. 72; The Cardiff Hall, 14 Asp. M. C. 328; The Emly, 14 Asp. M. C. 329; s. c., [1922] 1 K. B. 706); the question in each case being whether the nonobservance was necessary in order "to avoid immediate danger" (rule 27). In The Emly, supra, a speed of 8 knots in a fog was held excessive even for a convoyed ship in dangerous waters. I do not think that the Jupiter could be regarded as "in immediate danger." There was, of course, the chance that she might fall in with a submarine, one of the risks of war. But her situation was in no other way extraordinary; and it seems to have been contemplated and provided for by the naval order above referred to. She was in the usual track of shipping up and down the coast, a much-frequented part of the sea, as the number of vessels which she had met that afternoon shows. The surrounding conditions called for a high degree of care on her part for the safety of other vessels as well as herself. The order rather implies that under such circumstances she was not to omit the usual precautions in a fog; certainly it does not forbid her from taking them. As she was not "out of the usual track of shipping," her conduct cannot be justified under the order. After the accident she anchored near the Foss, something which would hardly have been done if the danger had been regarded as immediate. Her lookout was vigilant, and she was well handled after the emergency arose. It seems clear that she could have reduced her speed or blown her whistle while in the fog without unduly endangering herself, and I find her at fault for having done neither.

[2] The most difficult question in the case is whether the Foss was sounding her bell. Her crew—as is to be expected—testify that she was doing so. But neither the lookouts and deck officers on the Jupiter, who were evidently alert, nor Lindquist, her navigating officer, who was where he could have heard the Foss' bell, if it had been rung, heard any sound from her until after she had been sighted. As soon as her crew became aware of the Jupiter's presence, which I think was about the time when the Jupiter discovered the Foss, the bell on the schooner was undoubtedly rung. It was then too late to be of use as a warning. The crucial question is whether it had been rung during the two or three minutes before that, and the answer depends upon whether the direct evidence of the schooner's crew is regarded as outweighing the fact that nobody on the Jupiter heard it, as they would have been likely to do, if it had in fact been sounded. It is by no means inconceivable, or even improbable, that the Foss, being at anchor out at sea, might not be very vigilant in giving signals, but would rely on hearing the whistles of vessels under way in time to warn them of her presence by sounding her bell, and there is a suggestion that after the accident her bell was negligently attended to. There were half a dozen men in various positions on the Jupiter alertly attentive to their duties, who would naturally have heard the Foss' bell, if it were being rung; but none of them did. The rap-

id ringing of it after her lookout had become aware of the presence of another vessel was noticed at once on the Jupiter. It is hard to conceive a stronger case of negative evidence. On the other hand, the nine men on the Foss have all testified directly and positively that her bell was being rung. There are no discrepancies or contradictions in their testimony. But it is apparent that all of them understood that the interest of their vessel would be served by showing that her bell was properly rung.

We have therefore on one side a certain improbability that the schooner's crew would be so particular about ringing her bell as they say they were, and the fact that an unusually large number of witnesses, comparatively disinterested, who would naturally have heard it, did not do so, and on the other side the testimony of nine witnesses on the schooner, who are unimpeached, and whose testimony is direct and consistent, that the bell was rung. Such a mass of affirmative testimony carries weight; it ought not to be rejected as perjured on a mere suspicion that it is false. The situation here, while extreme, is similar to that presented in many previous cases, and the rule of the admiralty courts as I have stated it is well established. Genesee Chief v. Fitzhugh, 12 How. 443, 461, 13 L. Ed. 1058; The Alberta (D. C.) 23 Fed. 807; The Cherokee (D. C.) 15 Fed. 119, 121; The Hope and The Frederic L. Porter (D. C.) 4 Fed. 89, 93; cases collected 10 Am. Dig. (Cent. Ed.) cols. 579 and 580.

I may have and I do have, my doubts whether the Foss' bell was rung as her crew say; but they are only doubts. The burden is upon the respondent to prove the fault charged by it, and as the evidence stands a failure on the part of the Foss to give proper signals for a vessel at anchor in a fog is not made out.

The contention that the Foss was at fault for not allowing herself to drift farther inshore before anchoring seems to me plainly untenable. The other faults charged against her are not sustained and do not require discussion.

Let there be a decree for the libelant for full damages and referring the case to an assessor to state them.