**Petition of UNITED STATES et al.**

**The FRIAR ROCK.**

District Court, S. D. New York.
Jan. 9, 1947.

---

John F. X. McGohey, U. S. Atty., of New York City (Howard F. Fanning, Sp. Asst. Dist. Atty., of New York City, of counsel), for petitioners.

Paul C. Matthews, of New York City (Archibald F. McGrath, of New York City, of counsel), for claimants, Flavio A. de Queroz and James F. Egan, Adm'r of estates of following deceased: Elas Munga, Harold Olsen, Karl Thornberg, Wallis Roos, Joseph Kalinowski, Leif C. Staemose, Albinus Karlsson, Sven Landstroem.

Silas B. Axtell, of New York City, for claimants, Florentino Oliveira, Philip T. Wold, William James Finch, and James F. Egan, Adm'r of estate of Pierre Pino, deceased, and E. M. Wilson.

Harold Davis, of New York City, for claimant Gussie Dictor, Adm'x of estate of Abram Miller, deceased.

GODDARD, District Judge.

Petition of the United States as owner, and Waterman Steamship Agency, Limited, as charterer, and Waterman Steamship Corporation, as alleged charterer of the Steamship Friar Rock, for exoneration from or limitation of liability. The Waterman Steamship Corporation alleges that it did not at any time own, operate or have any interest in or connection with the Friar Rock, but has joined in this petition at the request and direction of the United States, and seeks such relief as it be found entitled to.

On October 11, 1941 the Friar Rock was delivered to the Waterman Steamship Agency, Limited, under bare boat charter made June 15, 1941. Under the charter Waterman Steamship Agency, Limited, agreed to maintain her machinery, boilers, appurtenances and spare parts in good order and condition, and for its own account and expense and by its own procurement to man, victual and navigate the vessel.

The Friar Rock, formerly the Italian Steamship Arsa, was built in Italy in 1921; was a steel steam cargo vessel 5441 gross tons, 404.1 feet long, 54.1 feet beam, and 29 feet depth of hold. She carried a gun on her stern and a machine gun on each side of her bridge, but did not have a navy gun crew. According to the testimony her master was an experienced mariner, although previously engaged principally in navigating between Central American countries and New Orleans.

In the early part of October, 1941, after taking on a cargo of ammunition and war supplies at New York and proceeding down the Bay, she began to fill with sea water, and it was then discovered that her sea cocks had been falsely labelled by the Italians from whom she had been taken over. It became necessary to beach her in Gravesend Bay. She had taken in some 14 or 15 feet of sea water and her engine room sustained considerable damage. She was unloaded, pumped out, taken to a ship yard where extensive repairs were made. On December 16, 1941 after survey made by the American Bureau of Shipping she was issued a certificate of seaworthiness retaining her classification of "A 1".

On December 23d, at 8:30 p.m., after reloading her cargo, she sailed for Halifax, Nova Scotia, with orders to join at Sydney

a convoy bound for Archangel, Russia. On the way from New York to Halifax trouble developed in her feed pump and some of her boiler tubes were leaking. She arrived in Halifax in two days and after additional repairs were made, left to join the convoy at Sydney arriving there on January 10th. As a result of this delay she was late and the convoy had gone. The master of the Friar Rock went ashore and conferred with the Navy Control officers and received sailing instructions. He was informed that it was a seven knot convoy and that he should overtake it. Chief Engineer Finch of the Friar Rock advised the master that she was capable of overtaking the convoy; that he thought she could make ten knots.

The Friar Rock left Sydney at about 10 p.m. January 10th, some six or seven hours after the convoy had sailed. Leaving Sydney, and as she proceeded at nighttime the Friar Rock's port and starboard lights, masthead and range lights were lighted. Several of the door openings were not properly screened so that light shone through; also some of the dark paint on the port holes had been scratched off in places permitting the light to show.

At about 4 a.m. on January 13th the Friar Rock was hit on the starboard side forward by a torpedo fired from a submarine. The starboard life boat was launched and the master and eighteen members of the crew of thirty-seven boarded it. The port life boat was also launched but nothing has ever been heard as to the fate of the other members of the crew. Shortly after the starboard life boat pulled away from the Friar Rock a second torpedo struck her and she sank within a few minutes. There was a strong shifting wind with heavy seas. There had been snow squalls but at the time of the attack the weather was clear and cold.

On January 17th the starboard life boat was picked up by a Canadian naval vessel and the seven surviving members in it were rescued. The other twelve had died from exposure during the three days in the life boat. One of the seven rescued died upon reaching Halifax. Of the remaining six who were rescued, five suffered amputation of one or more legs or feet as they had been frozen.

It is urged in behalf of the claimants—the injured seamen and the representatives of the deceased, that the petitioners were negligent and that the Friar Rock was unseaworthy in that the petitioners and officers allowed it to sail without convoy, in a defective and dangerous condition, failed to man her with competent officers and crew, failed to supervise and enforce proper and safe rules of seamanship on board the vessel, failed to equip and supply the life boats and to navigate the vessel with care and caution. The fault particularly stressed is the fact that the vessel, instead of sailing darkened out, carried improper lights unduly and unnecessarily exposing her to attack from submarines during a war in which many vessels were being attacked by enemy submarines, and contrary to the instructions of the Naval authorities. I think the charge that the Friar Rock was carrying improper lights is the most serious one, and if sustained, will make discussion of the other alleged faults unnecessary.

Prior to sailing from New York the master of the Friar Rock received "Route Instructions" for sailing to Halifax dated December 22, 1941 from the Third Naval District Office of Port Director, which included—

"2—Upon your arrival at Halifax, you will report to the Naval Control Service Headquarters for further instructions.

"4—On your voyage, darken ship completely. In this connection, be guided by Article 27, International Rules of the Road."

By letter dated December 19, 1941 addressed generally to steamship companies the Office of the Port Director communicated the following: "This office has been directed by the Navy Department to inform you that all U. S. flag ships, and all foreign flag ships, owned or chartered by the United States or citizens thereof must be completely darkened when running coastwise or on voyages to Canadian ports and points North to the West Indies and Colon, to South American ports, and to transatlantic destinations. In this connection Masters will be governed by Article 27, International Rules of the Road. All ships on voyages as specified in the preceding paragraph are

also to maintain strict radio silence at all times, except in a grave emergency."

A pamphlet of general instructions to merchant vessels was also issued November 6, 1940 by the United States Navy Department. This pamphlet contained instructions as to equipment of life boats, wearing apparel, etc., and special instructions for vessels when sailing alone, which provided that masters sailing unaccompanied on overseas or coastal voyages from United States ports must obtain routing instructions from the Commandant of the Naval District or his representative. This pamphlet also directed—

"230. When in areas in which submarines, raiders or aircraft are likely to be met, vessels are to be carefully darkened from sun set to sun rise and are to proceed without navigational lights."

"233. The thorough darkening of the ship from sun set to sun rise is of vital importance."

In these instructions and orders the United States Naval authorities stressed the precautions to be observed by ships upon the high seas to meet the dangers from enemy submarines and raiders and as one of the safeguards directed a thorough darkening of ships, and which is stated to be of vital importance.

At Sydney the master of the Friar Rock conferred with the Canadian Naval Control Service Officer and was given instructions and an envelope containing "Routine Orders for S. C. 64" [Convoy 64, which he was to join]. Included in the envelope were printed general orders. The substance of these instructions was that "Blackout arrangements must be rigidly enforced", all doors and openings carefully screened, but certain navigation lights are to be shown dimmed to a visibility not to exceed two miles, except the stern light, the visibility of which shall not exceed one mile. Four lights only—one masthead light, the red and green lights, and the stern light.

Captain Francis, the Canadian Control Service Officer at St. John, Newfoundland, testified that after the United States entered the war in December and the enemy submarines were becoming more active in the vicinity, orders were received from the Canadian Naval authorities to orally instruct all convoy commanders to black out completely, and he said that the same rules and regulations were enforced at Sydney as at St. John, but there is no actual proof that the master of the Friar Rock received this information.

Although the master of the Friar Rock may not have been told to completely black out, the proof is clear and convincing that he grossly disobeyed even the printed instructions. These instructions permitted only one masthead light which must be dimmed to a visibility of not more than two miles. But, according to all the evidence, the Friar Rock was proceeding at the time of the attack with both the forward masthead and the range light lighted and not dimmed; the light on the foremast was some 59 feet above the deck and the range light was 73 feet above the deck. The lights were the usual ship's lights with glass magnifying reflectors equipped with 50 Watt bulbs, and according to the uncontradicted testimony were visible at sea on a clear night from eight to eleven miles.

About 10 o'clock of the night before the sinking a corvette hailed the Friar Rock and told the master of the Friar Rock to blacken out. No record is available showing that it was a Canadian vessel, but in any event the master of the Friar Rock disregarded the message.

There was good reason why no more than one masthead light should be permitted. The normal purpose of the two lights —the masthead light and the range light —is to accurately inform other vessels of the course of the one showing the lights, her heading being determined by the opening or closing of the two lights. Moreover, it is undisputed that several of the door openings were not screened, including the door to the radio shack, the captain's room and others, each of which permitted light to shine on the bulkheads or the deck; also the dark paint on many of the port holes had been scratched off in places so that the light came through.

The danger of discovery and successful attack by an enemy war ship was greatly increased by the failure of the master of the Friar Rock to comply with the reason-

able precautions laid down by the Naval authorities, and in face of the warnings and instructions, he must be held to have been guilty of negligence which undoubtedly was a contributing or co-operating factor in the sinking of the Friar Rock with its serious consequences to the claimants.

It is contended in behalf of the Friar Rock that although war was declared by the United States on December 7, 1941 and an Executive Order was issued by the President authorizing the Secretary of the Navy to issue orders to provide for the better security of vessels and to waive compliance with the International Rules to the extent necessary to permit conformity with the instructions issued by Naval authorities, the Secretary of Navy did not issue such an order until March 19, 1942, so that in January it was the duty of the master to display the regulation lights under the International Rules.

██ However, in accordance with the authority vested in him by the President of the United States Executive Order No. 8976, Dec. 12, 1941, 46 U.S.C.A. note preceding section 1, the Secretary of Commerce on December 22, 1941 issued the following Regulation, Section 35, 2-1, 46 C.F.R. 1941 Supp.: "Notice to mariners; aids to navigation T/All. (a) Licensed officers are required to acquaint themselves with the latest information published by the U. S. Coast Guard and the U. S. Navy regarding aids to navigation, and neglect to do so is evidence of neglect of duty. * * *"

In any event the Friar Rock was not free to disregard the instruction of the Canadian Navy Control Service Officers who were in charge of vessels departing for the convoy. Such instructions and regulations are generally recognized as having the force of law both in this country and England. The Madiana, D.C., 63 F.Supp. 948, 951. Moreover, this was a case of "special circumstances" and in navigating with lights screened the Friar Rock would be doing what was justified and required by Article 27* of the International Rules

under which she was bound to have "due regard * * * to all dangers of navigation and collision". The Algol [1918] Probate 7, cited in Thurlow v. United States, D.C., 295 F. 905, 907; The Purfleet Belle [1918] Probate 72, Marsden's Collisions at Sea, 9th Ed., p. 422.

██ The negligence of the master of the Friar Rock while not the sole cause of the injuries sustained by claimants, was a substantial factor in bringing about a condition which resulted in their injuries and is sufficient to establish liability. Rey v. Colonial Nav. Co., 2 Cir., 116 F.2d 580, Restatement Torts, Sec. 449.

██ The petitioners are entitled to limit their liability under the Statute providing for limitation of liability, 46 U.S.C.A. § 183, as the fault was in the master's navigation of the Friar Rock and could not be imputed to her owner or charterer as having occurred with their "privity or knowledge". The Longfellow, 6 Cir., 104 F. 360.

There is no proof that the Waterman Steamship Corporation owned, chartered or operated the Friar Rock or had any interest in her.

A decree may be entered in conformity with this opinion including a provision for a reference to a Commissioner to find the damages.

Findings of fact and conclusions of law are filed herewith.

### Findings of Fact

I. The Steamship Friar Rock owned by the United States and under charter of the Waterman Steamship Agency, Limited, with a cargo of war munitions left New York on December 23, 1941, sailing under orders received from the American Naval authorities, and proceeded to Halifax, Nova Scotia, where, pursuant to those orders the master was to receive further instructions from the Canadian Naval authorities at Halifax.

II. Pursuant to the orders of the British Naval authorities the Friar Rock proceeded

---

* Title 33 U.S.C.A. § 112. "Special circumstances requiring departure from rules. Art. 27. In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

from Halifax to Sydney for the purpose of joining a convoy leaving from that port for Archangel, Russia. The Friar Rock was late in arriving at Sydney and the convoy left about seven hours before. The master of the Friar Rock was ordered to overtake the convoy, and received printed instructions to limit the navigation lights to one masthead light and the red and green lights dimmed to a visibility of not exceeding two miles and the stern light dimmed to a visibility of one mile, and to carefully screen all doors and places so that no light would be visible from them.

III. The Friar Rock left Sydney at 10 p. m. on January 10, 1942 to overtake the convoy.

IV. That during each night, after leaving Sydney, the Friar Rock exhibited lights imprudently and contrary to the instructions of the British Naval authorities as well as those of the American Naval authorities in exhibiting a foremast light and a range light; these lights, 59 feet and 73 feet respectively above the deck, were not dimmed but were visible for a distance of eight to eleven miles; and the door of the captain's cabin and the door of the radio shack were not screened, so that from them light shone upon the bulkheads and deck; also many of the port holes had the dark paint scratched off in places permitting the light to show through them.

V. That at approximately 4 a. m. on January 13, 1942 the Steamship Friar Rock was struck by two torpedoes from an enemy submarine and sank within a few minutes.

VI. That as the Friar Rock began to sink the order was given to abandon ship and take to the life boats. The starboard and the port life boats were launched. The port life boat was lost with all occupants and the starboard, after approximately four days at sea, was picked up by a Canadian Naval vessel.

VII. In the starboard life boat were nineteen members of the crew including the captain. When rescued twelve, including the captain, had died from exposure during the days the life boat was at sea. One of the seven survivors died ashore in the hospital. Of the remaining six five suffered amputation of one or more legs as a result of exposure.

VIII. The master of the Friar Rock was negligent in violating the instructions of the British and American Naval authorities; also in failing to exercise due precaution.

IX. The master's fault occurred without "privity or knowledge" of the owner or charterer.

X. There is no proof that the Waterman Steamship Corporation owned, chartered or operated the Friar Rock or had any interest in her.

### Conclusions of Law

1. The claims are dismissed as to the Waterman Steamship Corporation.

2. The master of the Friar Rock was guilty of negligence which was a contributing or co-operating cause of the injuries sustained by the claimants.

3. Petitioners are entitled to limitation of liability.