**Becky MATHENY, individually and as Surviving Spouse of Ronald Matheny, Deceased, Plaintiff,**

v.

**The TENNESSEE VALLEY AUTHORITY, Defendant/Third–Party Plaintiff/Counter–Defendant,**

v.

**Thomas Lawrence and Johnna Lawrence, Third–Party Defendant/Counter–Plaintiff and Counter–Plaintiff.**

**No. 3:06–0565.**

United States District Court, M.D. Tennessee, Nashville Division.

Dec. 11, 2007.

Jonathan R. Perry, The Perry Firm, Franklin, TN, Kristen V. Dyer, Philip Norman Elbert, Neal & Harwell, Nashville, TN, for Plaintiff.

Maureen H. Dunn, Office of the General Counsel, Thomas A. Robins, Edwin W. Small, Jared E. Mitchem, Tennessee Valley Authority, Knoxville, TN, Mark M. Mizell, Franklin, TN, for Defendant.

## SUPPLEMENTAL MEMORANDUM AND ORDER

ALETA A. TRAUGER, District Judge.

The plaintiff has filed a Motion to Alter or Amend (Docket No. 103), to which defendant TVA has responded in opposition (Docket No. 106). For the reasons discussed herein, the plaintiff's Motion will be granted, and the portion of the court's December 6, 2007 Order granting judgment to the plaintiff in the amount of $2,159,153.00 compensatory damages will be modified as set forth herein.

The plaintiff's motion is most properly analyzed under Rule 59(e) of the Federal Rules of Civil Procedure, which provides that all such motions "shall be filed no later than 10 days after entry of the judgment." Fed.R.Civ.P. 59(e). The Sixth Circuit has held that Rule 59(e) motions "to alter or amend final judgments may be granted based upon a clear error of law, newly discovered evidence, or to prevent a manifest injustice." *Russell v. GTE Government Systems Corp.*, 141 Fed.Appx. 429, 433 (6th Cir. 2005) (citing *GenCorp., Inc. v. American Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir.1999)). The plaintiff argues that the court failed to incorporate the deposition testimony of Dr. Marshall Crenshaw, Mr. Matheny's treating physician, in analyzing Mr. Matheny's life expectancy on June 5, 2005. Dr. Crenshaw's deposition testimony, report, and *curriculum vitae* were included in the plaintiff's proof but not read at this bench trial. By inadvertence, the court failed to read that information and include it in its analysis, which was clear error.

Dr. Crenshaw describes himself as an "interventional cardiologist." [1] As Mr. Matheny's treating physician from April 1997 until the time of his death, Dr. Crenshaw was in a unique position to observe the decedent's coronary artery atherosclerosis and related health issues. For instance, Dr. Crenshaw has himself assessed the vascularization of Mr. Matheny's heart with dye procedures and has ordered and reviewed cardiac stress tests to determine the heart's oxygen delivery. (Crenshaw Dep. at p. 18) Accordingly, the court must grant Dr. Crenshaw's opinions a certain amount of deference.

Dr. Crenshaw's deposition does not contradict the court's finding that Mr. Matheny suffered from serious heart disease. Mr. Matheny suffered his first heart attack in 1991 and his second, which was treated with an emergent angioplasty of the right coronary artery, in April 1997. (*Id.* at p. 19, 20)

---

**1.** According to Brigham and Women's Hospital, a teaching hospital associated with Harvard Medical School, interventional cardiology "refers to various non-surgical procedures for treating cardiovascular disease." Brigham and Women's Hospital, Cardiovascular Center, *http://www. brighamandwomens.org/ cvcenter/Patient/FAQ/FA-* *Qinterventional.aspx# whatis* (last visited December 11, 2007). Doctors practicing interventional cardiology "use catheters ... to get inside blood vessels for diagnostic tests or to repair damaged vessels or other structures, often avoiding the need for surgery." *Id.*

In conjunction with this angioplasty, six stints were placed inside Mr. Matheny's right coronary artery. (*Id.* at p. 22) Because these stints were not drug-coated, they have not successfully combated the narrowing of this artery, and Mr. Matheny has returned for successive treatments regarding this issue. (*Id.* at p. 24, 28) In 2001, 50–60% blockage was reported for this artery, demonstrating that Mr. Matheny's coronary atherosclerosis was progressing in this location. (*Id.* at p. 75)

In fact, notwithstanding the drug treatments and Dr. Crenshaw's efforts, Mr. Matheny's overall coronary health appears to have been deteriorating prior to the accident. Additional stints had been placed in Mr. Matheny's circumflex and other arteries. (*Id.* at p. 59). In 2002, an additional angioplasty was performed. (*Id.* at p. 62) Mr. Matheny's ejection fraction, which measures the percentage of blood pumped out of the heart with each successive beat, was progressively worsening, from 60% in 1997 to 45% in 2003. (*Id.* at p. 67–68). In addition, global hypokinesis, in which the walls move slower than normal, was reported in Mr. Matheny's left ventricle. (*Id.* at p. 68). As indicated by other witnesses, Mr. Matheny was, at the time of his death, a long-standing smoker, and his weight remained a serious health issue. In 1997, when Mr. Matheny began his treatment with Dr. Crenshaw, he weighed 235 pounds; in 2004, he weighed 240 pounds. (*Id.* at p. 83–84) Finally, Mr. Matheny's cholesterol readings appear to have been worsening at the time of his death. In September 2004, which was Mr. Matheny's last reading, all of his cholesterol measurements were above the normal range. (*Id.* at 89)

Nevertheless, Dr. Crenshaw testified that, in the days before Mr. Matheny's drowning, he considered Mr. Matheny's heart disease to be stable. (*Id.* at p. 36) Dr. Crenshaw noted that, if Mr. Matheny were to suffer additional heart attacks, he could still have been treated in a number of ways, such as through the placement of additional stints, bypass surgery, and even heart transplant. (*Id.* at p. 40) Dr. Crenshaw noted that Mr. Matheny did not suffer from diabetes and that his MRI and CT scans had not shown major neurological changes as a result of the stroke. (*Id.* at p. 42, 46) Although the autopsy showed a 75% obstruction in Mr. Matheny's left anterior descending artery, Dr. Crenshaw testified that this percentage overestimated the degree of stenosis because the arteries were not warm and distended, as is the case when the person is alive. (*Id.* at p. 48–49) In May 2001, Mr. Matheny was found to have 60% and mid–50% lesions in this artery. (*Id.* at p. 73) At 70%, an angioplasty must be performed. (*Id.* at p. 74)

Dr. Crenshaw testified that Mr. Matheny's life expectancy was at least fifteen to twenty years. (*Id.* at p. 51) Dr. James Davia had projected Mr. Matheny's life expectancy at three to five years. Both are medical professionals, but Dr. Crenshaw had been the treating physician for many years. Both projections can only be estimates, and both opinions may be imbued with some element of bias. Taking into account the many cardiac health issues outlined in Dr. Crenshaw's testimony as well as in the defense submissions of Dr. Davia, the court must estimate Mr. Matheny's life expectancy to have been eight years at the time of his death.

According to the tables submitted to the court by Dr. Cashdollar, the present value of Mr. Matheny's Tennessee disability pension, minus his maintenance expenditures, assuming a life-expectancy of eight years, is $45,861. (Defendant's Ex. 46) The present value of Mr. Matheny's household services for eight years is $78,491. (Defendant's Ex. 47) Therefore, damages in the amount of $124,352 will be awarded to the plaintiff for lost earning capacity.

Dr. Crenshaw's deposition testimony also affects the amount of damages that should be awarded to the plaintiff for loss of consortium. In light of that testimony and the court's finding as to life expectancy, Mr. Matheny's wife and children were deprived of his consortium for eight, rather than five years. Therefore, Mr. Matheny's wife and each of his three children will be awarded $800,000 for loss of consortium, for a total of $3,200,000. In total, the plaintiff is entitled to $3,324,352 compensatory damages.

For the reasons expressed herein, it is hereby **ORDERED** that the plaintiff's motion to amend is **GRANTED.** The portion of the court's December 6, 2007 Order granting

judgment to the plaintiff in the amount of $2,159,153.00 compensatory damages is herein **MODIFIED** to grant judgment to the plaintiff in the amount of $3,324,352.00.

It is so ordered.