RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0060p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

BECKY MATHENY, Individually and as
Surviving Spouse of Ronald Matheny,
Deceased,

*Plaintiff-Appellee,*

*v.*

TENNESSEE VALLEY AUTHORITY,
*Defendant/Third-Party Plaintiff/Counter
Defendant-Appellant,*

JOHNNA LAWRENCE; THOMAS LAWRENCE,
*Third-Party Defendants/Counter Plaintiffs-
Appellees.*

No. 08-5127

————————————

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 06-00565—Aleta Arthur Trauger, District Judge.

Argued: January 23, 2009

Decided and Filed: February 19, 2009

Before: SUHRHEINRICH, GRIFFIN, and KETHLEDGE; Circuit Judges.

————————————

**COUNSEL**

**ARGUED:** Edwin Warren Small, OFFICE OF THE GENERAL COUNSEL, TENNESSEE
VALLEY AUTHORITY, Knoxville, Tennessee, for Appellant. Philip N. Elbert, NEAL &
HARWELL, Nashville, Tennessee, Mark McClure Mizell, LAW OFFICE, Franklin,
Tennessee, for Appellee. **ON BRIEF:** Edwin Warren Small, Jared E. Mitchem, Thomas
A. Robins, OFFICE OF THE GENERAL COUNSEL, TENNESSEE VALLEY
AUTHORITY, Knoxville, Tennessee, for Appellant. Philip N. Elbert, W. David Bridgers,
NEAL & HARWELL, Nashville, Tennessee, Mark McClure Mizell, LAW OFFICE,
Franklin, Tennessee, Jonathan R. Perry, THE PERRY FIRM, Franklin, Tennessee, for
Appellee.

1

———————————

**OPINION**

———————————

SUHRHEINRICH, Circuit Judge.   This is an admiralty action arising out of a collision in which the wake of the Defendant-Appellant Tennessee Valley Authority (TVA) tugboat Patricia H capsized a small fishing boat.  Plaintiff Ronald Matheny, a passenger in the fishing boat, died as a result.  After a bench trial, the district court concluded that Matheny's death was caused by the negligent operation of the tugboat and that the TVA was not entitled to limitation of liability under the Limitation of Liability Act, 46 U.S.C.A. § 30505 (West 2007), because the captain's actions were within the privity or knowledge of TVA.  The TVA appeals.  We **REVERSE** in part and **REMAND** for further proceedings.

## I.  Background

### A.  Facts

The facts, issues, and relevant law are all adequately presented in the district court's fifty-seven page opinion and supplemental opinion following a bench trial and are very briefly summarized here.  *See Matheny v. TVA*, 523 F. Supp. 2d 697 (M.D. Tenn. 2007), *modified in part by Matheny v. TVA*, 247 F.R.D. 541 (M.D. Tenn. 2007).

TVA operates the Cumberland Fossil Plant (CFP), a coal-fired electric power generating plant, on the south bank of the Cumberland River at river mile 103 in Stewart County, Tennessee.  *See* TVA Act of 1933, 16 U.S.C. §§ 831-831ee (2000 & Supp. V 2005).  In the 1970s, TVA excavated a second channel and created an island approximately 6,000 feet long between the two channels.  TVA has a coal barge unloader and barge mooring cells along the south side of the old channel.  Since the early 1970s, various towing companies have delivered tows of barges loaded with coal to barge mooring areas in the old channel, and TVA has used TVA tugboats to move the barges to the unloader and then back to the mooring areas for pickup by the towing companies.

The Patricia H is one of the TVA tugboats used to move barges at CFP.  At the time of the accident, it was worth $420,000.

The TVA is aware that the old channel is used for recreational fishing by various types and sizes of boats. At approximately 5:30 p.m. on June 5, 2005, Third-Party Defendant/Counter-Plaintiff-Appellee Thomas Lawrence went fishing with his cousin, Matheny, in Lawrence's fourteen foot Phantom fiberglass boat in the old channel of the Cumberland River near CFP. Lawrence had fished there numerous times before.

At 7:00 p.m., Captain Ralls and his crew started their shift on the Patricia H. Shortly after 7:00 p.m., Captain Ralls piloted the Patricia H from the unloader downstream to pick up a loaded coal barge. As the Patricia H traveled from the unloader downstream "lightboat" (without a barge), it passed the Phantom boat without incident. As the Patricia H traveled back upstream to the unloader with a loaded barge, it passed the Phantom boat again without incident. However, at approximately 7:50 p.m., when the Patricia H came back downstream again to obtain another loaded barge, its wake swamped the Phantom boat. Both men were thrown overboard. The crew of the Patricia H were able to save Lawrence, but Matheny drowned.

Captain Ralls's immediate supervisor was David Duke, the coal haul foreman at CFP. Duke was responsible for ensuring that CFP employees obeyed safety rules. 523 F. Supp. 2d at 710. Duke testified that TVA has no yearly training program specifically for tugboat operators, that "TVA does not train the pilots in the 'Rules of the Road' except through informal 'on river' training," and that "there was no specific policy regarding the speed of tugboats, but that there was an expectation that the tugboats would be operated as slowly as possible around fishing boats." *Id.* Duke also testified that he was not aware of any prior incidents concerning Captain Ralls. *Id.* at 711.

Matheny was 49 years old when he died. Matheny suffered from coronary artery atherosclerosis and had a heart attack on September 27, 2004. 523 F. Supp. 2d at 728. He had a life expectancy of eight years. 247 F.R.D. at 543. He was not employed at the time of his death, but acted as primary caretaker for his granddaughter. He was drawing a disability pension from the Tennessee Department of Corrections and had applied for disability benefits from the Social Security Administration.

Mr. and Mrs. Matheny had been married since 1974 and lived for many years in middle Tennessee. The couple had three adult children–Elan (31 years old at the time of

trial), Christina (29 years old at the time of trial), and Stephanie (25 years old at the time of trial). One of Christina's children, Chloe, lived with Mr. and Mrs. Matheny, and they provided for her care. The district court found that Matheny had "a very close relationship with his children and his wife." 523 F. Supp. 2d at 730.

## B.  The District Court's Ruling

The district court found that Captain Ralls was an experienced tugboat captain,[1] and that he "proved himself, up to the time of the accident, to be a perfectly competent captain." *Id.* at 722. However, the district court also found, and TVA concedes, "that Captain Ralls violated Rules 2(b) and 6 of the Inland Rules of Navigation by operating the Patricia H at an excessive speed when it passed the fishing boat," *id.* at 714, and "that Captain Ralls's creation of an excessive wake was 100% responsible for the capsize of the fishing boat and the death of Mr. Matheny." *Id.* at 712.

The district court held that the Limitation Act did not apply to limit TVA's liability to the value of the Patricia H ($420,000) "because TVA had privity or knowledge of the risks posed by Captain Ralls['s] negligent operation of the Patricia H at an excessive speed." *Id.* at 721. "As a separate basis for liability" without limitation, the district court found that TVA negligently supervised Captain Ralls, "by failing to specifically instruct him to maintain a low speed or a low wake in the presence of small fishing vessels." *Id.* at 725. On the other hand, the district court found that TVA did not commit negligent entrustment: "Although the court finds that Captain Ralls was negligent in this specific instance, it finds no basis to question his overall competency

---

[1]The district court found that Captain Ralls

has a first class pilot license as well as a tow-operator license and has had safety training in conjunction with obtaining these licenses. In addition, Captain Ralls has earned endorsements to his licenses, allowing him to work on the deck of a boat, to use the radio, and to observe radar. Captain Ralls has been tested on the "Rules of the Road" portion of the Inland Rules of Navigation by the Coast Guard, specifically regarding passing, crossing situations, risk of collision, safety, and good seamanship. He has been trained in collision avoidance and considers the wake of his boat hitting another boat to be a collision. He has worked at several TVA harbors and has no prior citations or investigations regarding his performance.

523 F. Supp. 2d at 523.

as a tugboat captain. Accordingly, TVA did not commit negligent entrustment." *Id.* at 726.

The district court awarded Becky Matheny, as surviving spouse of Matheny, a total of $3,324,352, which represented $124,352 for lost future earnings and household services, and $3.2 million for consortium losses of Mrs. Matheny and Matheny's three adult children. *See* 247 F.R.D. at 543. The $124,352 figure represented the present value of Mr. Matheny's disability pension assuming a life expectancy of eight years, or $45,861, and the present value of his household services for eight years, or $78,491. *Id.* The $3.2 million represented $100,000 a year times eight years for each of his four family members. *Id.*

Thomas Lawrence and his wife were awarded a total of $238,685 based on Lawrence's injuries. *See* 523 F. Supp. 2d at 730.

## II.  Analysis

Factual findings from a bench trial are reviewed for clear error. *In re Cleveland Tankers*, 67 F.3d 1200, 1205 (6th Cir. 1995); Fed. R. Civ. P. 52(a)(6). Questions of law are reviewed de novo. *Pearce v. United States*, 261 F.3d 643, 647 (6th Cir. 2001).

### A.  Limitation of Liability

The Limitation of Liability Act states in relevant part as follows: "[T]he liability of the owner of a vessel for any claim . . . or liability described in subsection (b) shall not exceed the value of the vessel and pending freight." 46 U.S.C.A. § 30505(a) (West 2007).[2] Subsection (b) states in relevant part that "claims . . . and liabilities subject to limitation under subsection (a) are those arising from . . . any loss, damage, or injury by collision, or any act . . . done, occasioned, or incurred, without the privity or knowledge of the owner." *Id.* § 30505(b); *see Kellogg & Sons, Inc. v. Hicks (The Linseed King)*, 285 U.S. 502, 510 (1932). The Act "alters the normal rules of vicarious liability" by

---

[2]The Limitation Act was amended and codified on October 6, 2006. The amendments made no substantive change to the law. *See* 46 App. U.S.C. § 183(a) (2000).

limiting the ship owner's liability for any injuries caused by the negligence of the captain or crew to the value of the ship unless the owner himself had "privity or knowledge" of the negligent acts. *In re City of New York*, 522 F.3d 279, 283 (2d Cir. 2008) (internal citations omitted).

Limitation of liability involves two inquiries: (1) negligence or unseaworthiness, and (2) knowledge or privity of the vessel owner. *See In re Muer*, 146 F.3d 410, 415 (6th Cir. 1998); *Cleveland Tankers*, 67 F.3d at 1203. The burden of proving negligence is on the claimant; the burden of proving lack of privity or knowledge of the negligence is on the owner. *Muer*, 146 F.3d at 416; *Cleveland Tankers*, 67 F.3d at 1203.

TVA concedes on appeal that it is liable for Captain Ralls's negligence, but claims that it is entitled to limitation of liability because it had no privity or knowledge of Ralls's negligent act. Thus, the only issue is whether TVA had privity or knowledge of Ralls's negligent act. In answering this question, we are mindful that "[t]he shipowner's privity or knowledge is not measured against every fact or act regarding the accident; rather, privity or knowledge is measured against the specific negligent acts or unseaworthy conditions that actually caused or contributed to the accident." *Suzuki of Orange Park, Inc. v. Shubert*, 86 F.3d 1060, 1064 (11th Cir. 1996). Further, when the owner of a vessel is a corporation or government entity, the owner is charged with privity or knowledge of an officer, manager, or superintendent who has authority over the scope of activities out of which the liability occurred. *Coryell v. Phipps*, 317 U.S. 406, 410 (1943); *In re City of New York*, 522 F.3d at 293; *In re Kristie Leigh Enters.*, 72 F.3d 479, 481 (5th Cir. 1996).

The district court held that the Limitation Act did not apply "because TVA had knowledge of the *risks* posed by Captain Ralls's negligent operation of the Patricia H at an excessive speed." 523 F. Supp. 2d at 721 (emphasis added); *see also id.* at 722 (framing the "the relevant inquiry [as] whether the defendant had privity or knowledge of the risks posed by tugboats being operated too fast, creating potentially dangerous wakes for nearby fishing boats"). Thus, according to the district court, because TVA was aware of the fact that *if* a tugboat operates at an excessive speed it *may* create a

dangerous wake for nearby recreational boats, and TVA did not tell Captain Ralls that, TVA is fully liable.

The district court misreads the Limitation of Liability Act, which speaks in terms of *acts*, not *risks*. As TVA points out, it is indisputable that all vessel owners know that if a competent captain commits a negligent act, there is a risk of harm. Instead, the Limitation of Liability Act focuses on "the specific negligent acts or unseaworthy conditions that actually caused or contributed to the accident," *Suzuki*, 86 F.3d at 1064, and limits liability unless the owner has privity or knowledge of the specific act.

There is no evidence in this record to justify imputing knowledge to TVA about the specific conditions that led to the accident. TVA barges and fishing boats have peacefully coexisted for years in the area in which the drowning occurred. Lawrence and his friend James Stanley testified that the harbor is considered a safe place in which to fish, that they have fished there on hundreds of occasions without incident, and that they have continued to fish in the same area were the accident occurred even after Matheny's death. Although Stanley mentioned that on two occasions he saw wakes cause spillovers into fishing boats, two isolated incidents involving wakes causing spillovers into fishing boats do not impart knowledge to TVA about a dangerous condition. Thus, TVA was justified in assuming that the area was safe for both barges and fishing boats.

Furthermore, it is well-settled that under the Limitation of Liability Act, "an owner may rely on the navigational expertise of a competent ship's master." *Kristie Leigh*, 72 F.3d at 482. Here, the district court found that "Captain Ralls had proved himself, up to the time of the accident, to be a perfectly competent captain." 523 F. Supp. 2d at 722. The district court also found Captain Ralls had been tested on the "Rules of the Road" aspect of the Inland Rules of Navigation by the Coast Guard, had been trained in collision avoidance and considered the wake of his boat hitting another

boat a collision. *Id.* at 710.[3] Captain Ralls had no prior citations. *Id.* The court went so far as to add that "at the time of the accident, Captain Ralls appears to have been the most qualified tugboat captain that TVA employed." *Id.* at 726. A competent captain conversant in the Inland Rules of Navigation did not need to be told that an excessive wake would be dangerous to small fishing boats. TVA was entitled to rely on a competent captain's navigational knowledge and cannot be deemed negligent because it failed to inform Captain Ralls or any of its other captains not to be negligent by creating excessive wakes near recreational boats.

A Sixth Circuit case, *The Longfellow*, 104 F. 360 (6th Cir. 1900), is dispositive. The Longfellow was a passenger boat on the Ohio River. While departing the port of Cincinnati, the pilot allowed the Longfellow to become positioned in the river such that she was headed for the center pier of a railroad bridge, despite the assistance of a tugboat, the Hercules Carroll. *Id.* at 362. The pilot and captain were unable to avoid a collision, and the Longfellow struck the center pier of the railroad bridge. The boat immediately sank, and several lives and most of the cargo were lost. *Id.* The district court found liability in the amount of $60,000, but held that Longfellow's corporate owners were not liable beyond the value of the wrecked vessel, appraised at $250. *Id.* This Court affirmed the district court's finding that the collision was "due to faults of navigation" which "were without the knowledge or privity of the owners, who were

---

[3]The Inland Navigational Rules are statutory rules that "apply to all vessels upon the inland waters of the United States." 33 U.S.C.A. § 2001 (West 2001 and 2008 Supp.). Inland Rule 2 ("Responsibility") is codified at 33 U.S.C.A. § 2002 and provides in relevant part that "[i]n construing and complying with these Rules due regard shall be had to all dangers of navigation and collision and to any special circumstances, including the limitations of the vessels involved." Inland Rule 6, codified at 33 U.S.C.A. § 2006, provides in pertinent part that "[e]very vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions." Rule 6 further provides that "[i]n determining a safe speed," factors to be considered include "the state of visibility" and "the traffic density including concentration of fishing vessels or any other vessels." 33 U.S.C.A. § 2006(a)(i), (ii). The term "collision" is used in a broad sense under the Inland Navigational Rules to include a vessel's wake striking another vessel. *Bernert Towboat Co. v. USS Chandler*, 666 F. Supp. 1454, 1457 (D. Or. 1987). Captain Ralls had been trained in these rules and considered the wake of his boat hitting another boat a collision. 523 F. Supp. 2d at 710.

These Inland Rules of Navigation supply the "Rules of the Road" governing navigation on inland waters. *See Turecamo Maritime, Inc. v. Weeks Dredge No. 516*, 872 F. Supp. 1215, 1229 (S.D. N.Y. 1994) ("The Inland Navigation Rules encompass long-standing steering and sailing rules and principles, otherwise known as 'Rules of the Road', which govern navigation on inland waters.")

therefore exonerated from liability beyond the value of the wreck and freight." *Id.* at 364.

The Court explained:

The faults which the trial judge found were clearly faults in the navigation of the Longfellow*,* and cannot be imputed to her owners, as having occurred through their "privity or knowledge." If we assume that there was no positive prearrangement between the officers of the Longfellow and the Hercules Carrol as would secure the best co-operative results, it was the fault of those navigating those boats, and not of the owners of the Longfellow. . . . The navigation of the Longfellow was under the sole control and direction of her pilot, who was a licensed pilot of unquestionable reputation and skill.  It was for him to direct how the Hercules Carrol should assist, and the latter was subject to his orders and direction so far as the actual navigation of the Longfellow was affected. . . . The navigation of the towboat when lashed alongside of the Longfellow was necessarily to be governed by the navigation of the latter, and it was for the pilot to give such special orders as his judgment and the circumstances dictated.  Neither was it the personal fault of the owners that the navigators of the Longfellow did not stop and back [up] when smoke first obscured her pilot's view.  If there was fault, it was a fault of those controlling her navigation, and was without the knowledge or privity of the owners.

*Id.* Similarly, in this case, Captain Ralls was a skilled pilot, who should have exercised his judgment to slow down while passing the fishing boat in the channel.  The accident was caused by Captain Ralls's navigational decisions.

Other cases support the conclusion that Ralls's errors were mistakes of navigation, which do not justify denying limitation of liability.  For example, in *In re Omega Protein, Inc.*, 548 F.3d 361 (5th Cir. 2008), a 396-ton fishing vessel struck an oil platform at night.  The captain, acting as a helmsman, had turned the wheelhouse lights on to examine a broken refrigerator part, and the mirror effect of the wheelhouse lights prevented him from seeing out the windows or using the radar.  *Id.* at 373.  The Fifth Circuit affirmed the lower court's ruling that the captain's errors were mistakes of navigation by a competent captain not within the privity or knowledge of the vessel owner for limitation purposes.  *Id.* at 374.  The court pointed out that there was no pattern of improper or unsafe behavior by the captain, a twenty-year veteran with a

"spotless" record. *Id.* at 373. The Fifth Circuit rejected the argument that the owner did not provide sufficient training and supervision of the captain as to when he should use the radar's anti-collision alarm system because mistakes in navigation caused the accident. *Id.* Significantly, the Fifth Circuit concluded that while the plaintiff had demonstrated that the corporate owner did not do everything it could have done to ensure that the pilot knew the full capabilities of the boat's radar, or have a protocol in place, "the privity or knowledge standard does not require a vessel owner to take every possible precaution; it only obliges the owner to select a competent master and remedy deficiencies which he can discover through reasonable diligence." *Id.* at 374.

Also illustrative is *United States v. Sandra & Dennis Fishing Corp.*, 372 F.2d 189 (1st Cir. 1967). There, five lives on the fishing vessel B&G were lost when a Coast Guard patrol boat (the "95") towed the B&G onto a shoal in bad weather. *Id.* at 191. The district court had denied limitation because it found both negligent navigation by the 95's commanding officer, Lieutenant Junior Grade McManus, and deficiencies in the 95's equipment, which were known to Commander Waters, the officer in charge of the Coast Guard Rescue Coordination Center that dispatched the 95, and a managing officer of the government for limitation of liability purposes. *Id.* at 191-92, 198-99. The First Circuit reversed the limitation holding, finding that the equipment deficiencies were not the cause of the loss, *id.* at 198, but that the loss was caused by "the impropriety of the conduct of McManus, as captain, in navigating the vessel." *Id.* at 199. The court further concluded that "[i]t is against this very liability that the right to limit exists." *Id.*

The district court's reliance on *The Linseed King*, 285 U.S. 502, is misplaced. The Linseed King was a ferry boat used to ferry workers from the foot of Ninety-Sixth Street in New York City across the Hudson River to the owner's linseed oil factory on the west shore of the river at Edgewater, New Jersey. *Id.* at 506. On an early morning trip across the river, the ferry struck an ice floe and sank in two minutes. *Id.* at 507. Over thirty-five people died. *Id.* The Supreme Court found privity or knowledge and denied limitation of liability because "[t]he Linseed King was admittedly unfit to run through ice." *Id.* at 510. More importantly, this fact was known to the owner's executive

officers, who had instructed the Edgewater plant manager, Stover, "that the boat should never be run through ice, and that as soon as ice showed itself in the river she was to be laid up for the winter." *Id.* Stover had also been "directed that whenever there was a likelihood of the presence of ice all trips were to be made only in broad daylight, and even these were to be discontinued when ice definitely appeared." *Id.* "The decision as to when the ferry should be withdrawn for the winter rested with him," and ice had been observed in the river some days prior to the accident. *Id.*

The Supreme Court agreed with the lower courts that "Stover's position as the works manager of the Edgewater plant and the scope of his authority render his privity or knowledge that of the company," and that "[t]he owner was therefore chargeable with negligence in not taking measures for the safety of the passengers which the weather conditions required." *Id.* at 511. The Supreme Court rejected an argument that the owner was not liable because he had a competent master who had been instructed not to run through ice, and that once he encountered it, it became his duty to abandon the trip such that the owner did not have privity. *Id.*

> But there is a vast difference between the cases relied on and the instant one. The launch was used for ferriage over a distance of about a mile and a third. She was known to be unseaworthy and unfit if there was ice in the river. There is no analogy between such a situation and that presented in the cited cases where the emergency must be met by the master alone. In these there is no opportunity for consultation or cooperation or of bringing the proposed action of the master to the owner's knowledge. *The latter must rely upon the master's obeying the rules and using reasonable judgment.* The conditions on the morning in question could have been ascertained by Stover, if he had used reasonable diligence, and we think the evidence is adequate to support the finding that the negligence which caused the disaster was his, and therefore with the owner's privity or knowledge.

*Id.* at 511-512 (emphasis added).

*The Linseed King* is not analogous because the Patricia H was not unseaworthy and there were no weather conditions to alert Duke or anyone else that special care needed to be taken. Rather, the accident here occurred because Ralls did not obey the rules of navigation or use reasonable judgment, let alone common sense, during a fairly

routine occurrence in the harbor–the presence of small fishing boats. Duke had no way of anticipating that Ralls would not do so in this instance.[4]

Also distinguishable are cases where the owners knew of unseaworthiness or crew incompetence prior to the accident at issue. *See, e.g. Trico Marine Assets, Inc. v. Diamond B Marine Servs., Inc.*, 332 F.3d 779, 790 (5th Cir. 2003) (finding no limitation of liability where captain misread his radar and attempted to conduct an improper passing maneuver leading to a collision because the captain had no training in how to use the radar and had not otherwise received safety training, and the vessel owner had not evaluated the vessel's seaworthiness or the captain's qualifications, and knew that the captain had previously operated the vessel in the fog but did nothing about it); *Hercules Carriers, Inc. v. Claimant of State of Fla.*, 768 F.2d 1558, 1576-77 (11th Cir. 1985) (limitation did not apply where the evidence showed that the collision occurred because the company had unwritten policies of putting the pilot rather than the master in command and of instructing its crews not to countermand the actions of the pilot, demonstrating the owner's knowledge and privity as to the crew's negligence and unseaworthiness; further, the owner should have known that the crew was not properly licensed).

In short, the accident was caused by Captain Ralls's navigational decisions as captain of his ship and his acts cannot be imputed to TVA because there is no evidence that TVA had privity or knowledge of the acts that led to the injuries here.

## B. Negligent Supervision

TVA also challenges the district court's conclusion that it is not entitled to limitation of liability because of "negligent supervision" of Captain Ralls. Although the Inland Navigation Rules 2(b) and 6 impose a legal duty to maintain an appropriate speed, there is no legal duty on a vessel owner to specifically instruct a licensed captain to follow them prior to a voyage. *See In re MO Barge Lines, Inc.*, 360 F.3d 885, 891 (8th

---

[4]Although Matheny alleged that the Patricia H was deficiently equipped and thus unseaworthy, the district court found that the accident was not caused by any equipment deficiencies. 523 F. Supp. 2d at 713 n.4.

Cir. 2004) (holding that owner was entitled to limitation even though the owner "failed to explicitly advise [the pilot] that he was required to follow the [Inland Navigational] Rules" where the record established that pilot was a licensed, competent operator, who had been accident free for seven years and had complied with the Rules). Rather, "[t]he owner's duty is essentially satisfied when he properly equips the vessel and selects competent crew to operate it." *Id.* In other words, "for limitation purposes, an owner may rely on the navigational expertise of a competent ship master." *Kristie Leigh*, 72 F.3d at 482. *See also Omega Protein*, 548 F.3d at 374 (stating that the "privity or knowledge" rule "does not require a vessel owner to take every possible precaution; it only obliges the owner to select a competent master and remedy deficiencies which he can discover through reasonable diligence"); *In re Am. Milling Co.*, 409 F.3d 1005, 1020 (8th Cir. 2005) (affirming limitation of liability against argument that owner failed to adequately train the captain and to educate him about currents in the river, noting that the "argument rest[ed] entirely on the presumption that [the pilot] was incompetent and that the pilot did not, as the district court found, commit a spontaneous navigational error").

Here, TVA did just that: it relied on the navigational expertise of an experienced competent operator with knowledge of the "Rules of the Road." There was no duty on TVA to remind Captain Ralls to follow those rules. Therefore, the district court erred in holding that TVA negligently supervised Ralls by failing to instruct him not to operate the Patricia H at an excessive speed around small fishing boats.

TVA also asserts that the discretionary function doctrine precludes liability based on the alleged negligent supervision of federal employees. Because TVA is a "'wholly-owned corporate agency and instrumentality of the United States,'" *Edwards v. Tenn. Valley Auth.*, 255 F.3d 318, 322-23 (6th Cir. 2001) (quoting *Hill v. U.S. Dep't of Labor*, 65 F.3d 1331, 1333 (6th Cir.1995)), the doctrine potentially applies here. *See id.* However, given our conclusion that the facts do not support a negligent supervision claim in this case, we need not address this question.

### C.  Consortium Damages

Both parties agree that damages based on loss of consortium are permissible in this admiralty case because Tennessee's wrongful death statute, Tenn. Code Ann. § 20-5-113 (1994 & Supp. 2006), allows for recovery of the pecuniary value of the decedent's life, which includes not only lost earning capacity but also the value of tangible household services lost and the value of intangible consortium losses sustained by a decedent's spouse and children.  *See Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593, 601-02 (Tenn. 1999).[5]  TVA does not contest the district court's findings and awards regarding the value of Mr. Matheny's lost future earnings and tangible household services but takes issue with the loss of consortium award.  Because we are reversing and remanding with instructions to the district court to apply the limitation of liability under 46 U.S.C. § 30505, we leave it to the district court to apportion liability between the Lawrences and Becky Matheny.

### III. Conclusion

For the foregoing reasons, the judgment of the district court is **REVERSED** in part and the case **REMANDED** for further proceedings consistent with this opinion.

---

[5]The Tennessee Supreme Court also held that "consortium-type damages may be considered when calculating the pecuniary value of a deceased's life . . . [and do] not create a new cause of action but merely refines the term 'pecuniary value.'" *Jordan*, 984 S.W.2d at 601.