IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 26, 2012 Session

IN RE ESTATE OF CHARLES B. LEHMAN

Appeal from the Tennessee Claims Commission
No. T20050805      Stephanie Reevers, Commissioner

No. M2011-01586-COA-R3-CV - Filed May 25, 2012

Claimant filed a claim with the Tennessee Claims Commission to recover for the wrongful death of his father, a resident of Middle Tennessee Mental Health Institute; the Commission awarded damages for loss of consortium, pain and suffering, and medical and funeral expenses. Claimant appeals the amount of damages awarded for loss of consortium and pain and suffering. We affirm the damages awarded for loss of consortium and modify the award of damages for pain and suffering.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Tennessee Claims
Commission Affirmed in Part and Modified in Part

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ., joined.

James S. Higgins, Nashville, Tennessee, for the Appellant, Herschel Charles Lehman.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; and Heather C. Ross, Senior Counsel, for the Appellee, State of Tennessee.

OPINION

BACKGROUND

Charles Lehman, who suffered from brain damage, complications arising from encephalitis, and other psychiatric problems, was a patient and long-term resident at Middle Tennessee Mental Health Institute ("MTMHI"). On March 19, 2004, he ingested aftershave and suffered acute alcohol poisoning; he was transported to Summit Medical Center for emergency treatment and remained hospitalized until his death on March 30.

Mr. Lehman's son, Herschel Lehman ("Claimant"), filed a claim with the Tennessee Claims Commission, asserting that MTMHI was negligent for failing to provide a safe environment for Mr. Lehman, failing to protect him from a dangerous substance, and allowing him to ingest a dangerous substance. Claimant sought damages for Mr. Lehman's pain and suffering, medical and funeral expenses, and loss of consortium. The State admitted liability and the matter was tried on the issue of damages. On May 26, 2011, judgment was entered awarding $15,000 for loss of consortium, $20,000 for pain and suffering, $69,964.17 in medical expenses, and $6,568.03 in funeral expenses.

Claimant appeals, asserting that the award of damages for pain and suffering and for loss of consortium are inadequate.

STANDARD OF REVIEW

Because the Claims Commission hears cases without a jury, we review the Commission's factual findings and legal conclusions using the standard in Tenn. R. App. P. 13(d). *Bowman v. State*, 206 S.W.3d 467, 472 (Tenn. Ct. App. 2006). Therefore, the Commission's factual findings are reviewed *de novo* with a presumption of correctness unless the evidence preponderates otherwise; legal conclusions are reviewed *de novo* and are not entitled to a presumption of correctness. *Id.* (citing *Beare Co. v. State*, 814 S.W.2d 715, 717 (Tenn. 1991); *Dobson v. State*, 23 S.W.3d 324, 328–29 (Tenn. Ct. App. 1999); *Sanders v. State*, 783 S.W.2d 948, 951 (Tenn. Ct. App. 1989); *Turner v. State*, 184 S.W.3d 701 (Tenn. Ct. App. 2005); *Crew One Productions, Inc. v. State*, 149 S.W.3d 89, 92 (Tenn. Ct. App. 2004); *Belcher v. State*, No. E2003-00642-COA-R3-CV, 2003 WL 22794479, at *4 (Tenn. Ct. App. Nov. 25, 2003)).

The right of recovery for wrongful death is strictly a creation of statute. *Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593, 597 (Tenn. 1999). Tenn. Code Ann. § 20-5-113 provides that where a "wrongful act, fault or omission" causes death, the party suing shall have the right to recover "for the mental and physical suffering, loss of time and necessary expenses resulting to the deceased from the personal injuries, and also the damages resulting to the parties for whose use and benefit the right of action survives from the death consequent upon the injuries received." Tenn. Code Ann. § 20-5-110 provides that "a suit for the wrongful killing of the spouse may be brought in the name of the surviving spouse for the benefit of the surviving spouse and the children of the deceased." Our Supreme Court has held that Tenn. Code Ann. § 20-5-110 also permits a child to recover damages for loss of parental consortium. *Jordan*, 984 S.W.2d at 601.

Damages under Tenn. Code Ann. § 20-5-113 are delineated into two distinct categories: (1) recovery for injuries sustained by the deceased from the time of injury to the

time of death, including medical expenses, physical and mental pain and suffering, funeral expenses, lost wages, and loss of earning capacity; and (2) recovery of incidental, or loss of consortium, damages suffered by the decedent's next of kin, including the pecuniary value of the decedent's life. *Id.* Loss of consortium "consists of several elements, encompassing not only tangible services provided by a family member, but also intangible benefits . . . includ[ing] attention, guidance, care, protection, training, companionship, cooperation, affection, [and] love . . . ." *Id.* at 601. The amount of damages to be awarded is a factual question. *Rinehart v. State*, 01A01-9309-BC-00428, 1994 WL 126803, at *3 (Tenn. Ct. App. Apr. 13, 1994).

Because Claimant challenges the Commission's award for both categories of damages defined in *Jordan*, we will analyze each category separately.

DISCUSSION

I. Loss of Consortium and Pecuniary Value

The Commission awarded $15,000 for the loss of consortium claim. In its order, the Claims Commission made extensive factual findings regarding Mr. Lehman's history of mental illness and viral encephalitis; the circumstances surrounding his ingestion of the aftershave and subsequent medical treatment; the medical proof of causation of his death; and the relationship between Claimant and Mr. Lehman. The Commission set forth its findings and summarized the testimony relevant to the claim as follows:

> [Claimant] was born on October 3, 1977. [He] was about six years old when his father contracted encephalitis, so most of his memories are after this illness. He could, however, recall waiting for his father to return home after he had been on the road.
> [Claimant] lived in Clarksville with his grandmother, Loraine Lehman. When [Claimant] was a child, his grandmother and aunt took him to visit his father at [Middle Tennessee Mental Health Institute] and at nursing homes where he resided. Periodically, Lorraine Lehman and [Mr. Lehman's] sister Joan Mullins would pick up [Mr. Lehman] from an institution and bring him to family events like Easter, Thanksgiving, and Christmas. While [Claimant's] father was at MTMHI, he typically saw him once or twice every six months and visited with him in a sitting area. He never went to his room and they never spoke by phone.
> [Claimant] testified that he had a loving relationship with his father, despite his disability. He conceded, however, that because his father was confined in a mental institution, medicated, and had encephalitis, their

-3-

relationship was not typical. He could not look to his father for financial assistance, help with homework or advice. After becoming an adult, [Claimant] did not see his father as often as he had as a child.

[Claimant's aunt], Joan Mullins, called and told [him] about his father's accident and hospitalization. He went to Nashville to see him at Summit [Medical Center] while he was on life support and participated in that decision. He subsequently returned to Clarksville where he lived, however, and communicated with his aunt and grandmother concerning his father's condition from there. He believed that his father had been getting better when he learned of his death. He was 25 years old when his father died.

The judgment also cited the testimony of Steven Silas, M.D., who testified, *inter alia*, that Mr. Lehman's life expectancy was approximately two years due to his encephalitis and dementia.[1] The Commission also found that "it is not disputed that Mr. Lehman had no earning capacity at the time of his death."

Claimant asserts that the amount of damages awarded for loss of consortium "does not recognize that [Claimant] had a genuine, valuable relationship with his father." He contends that the evidence preponderates in favor of a higher award because he "lost so many of the intangible benefits of a father son relationship as a result of the wrongful death."

Damages for loss of consortium are classified as incidental damages, and have been judicially defined to include the pecuniary value of the decedent's life. *Id.* at 600 (citing *Spencer v. A-1 Crane Serv., Inc.*, 880 S.W.2d 938, 943 (Tenn. 1994)). Courts determining the pecuniary value of a decedent's life may consider "the expectancy of life, the age, condition of health and strength, capacity for labor and earning money through skill, any art, trade, profession and occupation or business, and personal habits as to sobriety and industry." *Id.* at 600. One basis for placing an economic value on parental consortium is that the education and training which a child may reasonably expect to receive from a parent are of actual and commercial value to the child; thus, when a defendant tortiously causes the death of the child's parent, the child sustains a pecuniary injury for the loss of parental education and training. *Id.* at 601. Although an adult child is not automatically precluded from receiving parental consortium damages, the relationship between an adult child and the child's parent may be too attenuated in some cases to proffer sufficient evidence of consortium losses, and the adult child inquiry shall take into consideration factors such as closeness of the relationship and dependence. *Id.*

---

[1] Dr. Silas, a board certified physician who participated in Mr. Lehman's medical care at Summit Medical Center, testified by deposition.

Mr. Lehman was 56 years old and had no earning capacity at the time of his death. Uncontroverted testimony was that, due to his deteriorating mental and physical condition, he likely would have died within two years. Claimant, who was 25 years old at the time of the hearing, testified that he visited his father once or twice every six months as an adult; that they had no other interaction or communication; that his father was not able to provide any financial help or parental advice; that he was not dependent on Mr. Lehman in any way; and that his relationship with his father was "not typical."

We are aware that the pecuniary value of the intangible benefits between a father and son is not easily calculated and cannot be derived by application of a mathematical formula; Claimant nevertheless bears the burden of showing that the evidence preponderates against the judgment of the Claims Commission. *Coakley v. Daniels*, 840 S.W.2d 367, 370 (Tenn. Ct. App. 1992) (citing *Capital City Bank v. Baker*, 442 S.W.2d 259, 266 (Tenn. Ct. App. 1969)). Although Claimant testified that he and his father had a loving relationship despite his father's history of mental health problems and limited cognition, and that Claimant suffered the loss of intangible benefits when his father died, that testimony is not sufficient evidence to conclude that the amount of damages for loss of consortium should have been higher.

After considering the factors outlined by our Supreme Court in *Jordan*, we hold that the evidence does not preponderate against the award of damages for loss of consortium, and the Commission's judgment with respect to loss of consortium is affirmed.

## II. Pain and Suffering Damages

The Commission awarded Claimant $20,000 as damages for his father's pain and suffering. Claimant acknowledges that Mr. Lehman's pain and suffering was "likely minimal" while he was in the coma; he asserts that, in light of the fact that Mr. Lehman awoke from the coma to "multiple new problems, injuries, infections and medical conditions that he could likely not comprehend," the award for pain and suffering was inadequate.

Pain and suffering encompasses the physical and mental discomfort caused by an injury, and includes the "wide array of mental and emotional responses" that accompany the pain, characterized as suffering, such as anguish, distress, fear, humiliation, grief, shame, or worry. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 715 (Tenn. Ct. App. 1999). Damages for pain and suffering are not easily quantified and do not lend themselves to easy valuation. *Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 210 (Tenn. Ct. App. 2008). Accordingly, determining the amount of these damages is appropriately left to the sound discretion of the judicial finder-of-fact, and when reviewing an award of non-economic damages we do not determine whether the amount of damages awarded strikes us as too high

or too low. *Id.* at 210–11. Rather, we review the evidence in the record to determine whether material evidence supports a finding that the award is within the range of reasonableness. *Id.* (quoting *Dunn v. Davis*, No. W2006-00251-COA-R3-CV, 2007 WL 674652, at *9 (Tenn. Ct. App. Mar. 6, 2007)).

The "range of reasonableness" embraces both the upper and lower limits of recovery and is established by the proof presented at trial. *Foster v. Amcon Int'l, Inc.*, 621 S.W.2d 142, 146 (Tenn. 1981). "The upper and lower limits of [the range of reasonableness] must be determined by a reasoned examination of the credible proof of damages and all factors that have bearing upon the amount of recovery." *Smith v. Shelton*, 569 S.W.2d 421, 427 (Tenn. 1978). Inasmuch as Claimant is challenging the $20,000 award as inadequate, our inquiry is focused on whether the evidence supports this amount as being the lower limit of reasonableness for the pain and suffering shown by the evidence. To guide our analysis, we consider cases which discuss awards of damages for pain and suffering.

In 2007, a federal district court in Tennessee awarded $75,000 for the pain and suffering of a fisherman who drowned in a boating accident. *Matheny v. Tennessee Valley Auth.*, 523 F. Supp. 2d 697, 728 (M.D. Tenn. 2007) *modified in part*, 247 F.R.D. 541 (M.D. Tenn. 2007) *rev'd in part*, 557 F.3d 311 (6th Cir. 2009). The evidence showed that the fisherman spent approximately ten minutes struggling to stay afloat and breathe before losing consciousness; in making the award the court stated that the fisherman "undoubtedly experienced excruciating pain and terror." *Id.*[2]

In 1988, a district court in Tennessee held that a jury's award of $100,000 for pain and suffering was excessive and against the weight of the evidence, and suggested a remittitur of $75,000. *Sharpe v. City of Lewisburg, Tenn.*, 677 F. Supp. 1362, 1365 (M.D. Tenn. 1988). The decedent in *Sharpe* had been shot by police; he was conscious when he was placed in the ambulance and was dead upon arrival at the hospital. The court reasoned that "[h]e could not have lived more than a few minutes from the time of injury until death." *Id.*

In 1983, this Court affirmed a trial court's decision to increase awards of compensatory damages to a 21-year-old man and an 8-year-old girl, who sued to recover for injuries sustained in an automobile collision. *Owen by White v. Locke*, 650 S.W.2d 51, 52–53 (Tenn. Ct. App. 1983). The trial court increased the award to the man from $26,325 to $40,000, and to the girl from $4,252.37 to $20,000. On appeal, this Court noted the

---

[2] On appeal, the Sixth Circuit Court of Appeals held that the Limitation of Liability Act, 46 U.S.C. § 30505(a), limited the defendant's liability for the fisherman's death, and remanded to the district court to apply the limitation of liability under 46 U.S.C. § 30505. The award for pain and suffering was not challenged.

evidence that the man's hospital bills were in excess of $11,000, that he expected to incur $1,500 more for an additional medical procedure, that he had lost $5,000 in wages, and that he had sustained a 10% permanent partial impairment. With specific reference to damages for pain and suffering, the court stated:

> Owen sustained a severe, painful and debilitating injury. A competent orthopedic surgeon testified as to the nature and extent of his injuries as well as to the expensive, prolonged and painful nature of the treatment. The extreme discomfort of lying in a hospital bed, enmeshed in a leg traction device with holes punched into his limbs, warrants, in and of itself, substantial damages for pain and suffering.

*Id.* at 52. Similarly, with respect to the award of pain and suffering damages to the girl, we noted that the amount of medical expenses, which exceeded $11,000, "were quite large" and "reflect[ed] upon the seriousness of the injury," and that the nature of her injury—a broken femur—required "a prolonged and painful treatment" followed by "a rehabilitative process, all of which is quite painful and discomforting." *Id.* at 53.

These cases show that the factors and evidence to be considered in making an award of damages for pain and suffering include, in addition to the nature of the injury itself, the amount of medical expenses, the discomfort experienced in being treated and the length of time between injury and death.

The Commission made the following findings regarding Mr. Lehman's initial presentation, course of treatment, and hospitalization:

> On March 19, 2004, Mr. Lehman ingested half of a bottle of "Lucky Tiger" aftershave and was transported from MTMHI to Summit Medical Center for Emergency Treatment. Mr. Lehman, who was in a coma, presented with an alcohol level of 560 and aspiration pneumonia. He was placed on a ventilator to support his lungs. His physicians noted findings indicative of pneumonia and sepsis.
>
> . . . . Although Mr. Lehman had a [Do Not Resuscitate] order in place prior to the incident, his family permitted him to be put on life support for a short period to give him an opportunity to recover. Lehman regained consciousness and was taken off the ventilator on March 20, 2004.
>
> After Mr. Lehman began choking during efforts to feed him indicating swallowing difficulty, endoscopic tests were conducted to determine the feasibility of placement of a feeding tube by percutaneous endoscopic gastrostomy ("PEG tube") and balloon dilation. The endoscopy revealed the

poor state of Mr. Lehman's esophagus, which was coated with a white exudate believed to be candida. Tests also revealed old food and secretions that had dried up in his airway and that had to be cleaned up. Because his esophagus could not support a PEG tube, surgery was subsequently performed to place a gastrostomy tube so that he could be fed.

Sometime after the procedure, Mr. Lehman went into respiratory distress. After discussion with his family, a new DNR order was put in place. Mr. Lehman's condition deteriorated and he was pronounced dead on May 30, 2004.

During his hospitalization, Mr. Lehman was confined to his bed in soft wrist restraints because of his confusion, disorientation and attempts to grab at his tubes or dressings. He was catheterized. His records do not reflect that he was in pain, although several notes reflect periods of agitation, particularly as his condition deteriorated. On one occasion, nurses noted that "[h]e is getting agitated again, slamming hands against the bed, loosening his wrist restraints and getting hold of his foley."

Mr. Lehman had to be repeatedly suctioned to clear his airway. On one occasion, his sitter reported that he appeared to be uncomfortable. No reports of hunger or thirst from Mr. Lehman or his family appear in the records, although on one occasion Lehman, who was a heavy smoker, asked for a cigarette. He was briefly on a ventilator and required surgery to place the feeding tube.

Regarding Mr. Lehman's initial admission in the hospital, Dr. Silas testified:

The diagnosis that I had formed when I first saw him . . . was that he had an acute, which means sudden, alcohol intoxication, mental status changes, meaning that the brain function was worse or more towards the comatose side based on his -- compared to his baseline. I understand that he had some impairment at baseline. But this had worsened his baseline brain function. And as a result of that he had aspirated -- aspiration of stomach contents, meaning he swallowed into his lungs and developed pneumonia, developed a severe sudden blood poison or a sepsis reaction. And as a result of that he had other organs that were being affected, such as his heart and his kidneys and his liver and bone marrow by this infection.

Dr. Silas testified that he treated Mr. Lehman's "severe aspiration and pneumonia and respiratory failure and circulatory shock . . . with fluids, antibiotics and support[ed] those lungs by life support ventilation," and that "because this was an event that was sudden and onset and potentially reversible, the family and, I guess, the medical staff ourselves decided

that it was worth giving him a trial of two or three days of life support." Dr. Silas testified that Mr. Lehman was unconscious when he arrived at the hospital on March 19, but that Mr. Lehman regained consciousness on his second day in the hospital and remained conscious until his death on March 30. Dr. Silas testified that Mr. Lehman was unable to eat food without aspirating, and that a feeding tube was surgically inserted through his abdomen into his stomach, but that he still experienced a second "aspiration event." Dr. Silas testified that Mr. Lehman's pneumonia improved during his hospitalization but that it had not improved fully, and that his infection worsened when Mr. Lehman continued to aspirate.

Mr. Lehman's sister, Joan Mullins, testified that she visited Mr. Lehman every day during his hospitalization. She testified that, after he awoke from his comatose state:

> He was put in a room and at some point after that, after they disconnected him from all of that and he was put in a room. And my sister and I went every day to see him, and [MTMHI] furnished a sitter to sit with him. And he was on medications and IV's and he couldn't -- he choked and coughed, and choked and he coughed. And they decided one day right after that, he went into this talking and all day, he talked. He would say this thing all day, and we would try -- I'd try to figure out what it was. And it was like something like omni, omni, omni. And finally, at the end of the day, my sister said, I think I know what he's saying, are you -- are you saying hungry? He said, omni, omni. And so, he was hungry.
>
> And -- and I told the nurse. I said, he's really hungry, is there any way I can feed him? She said, oh, yes. . . . So, she brought me a tray that had applesauce on it . . . I tried to feed him and he got choked, and he choked and coughed and fell over in the bed. I -- I couldn't -- I said, "Charles, what did I do? What did I do?" And he finally coughed some of that up. And so then he pointed, like he wanted some more. So, I tried to feed him again and the second time was worse. And he got choked and coughed and coughed. . . . So, [the nurse] fed him the applesauce. And she -- she said, "now, we're going to do -- we're going to do this slow, Charles, and we -- you're going to swallow this and it's going to be okay." So, she gave him a couple bites and it all -- he got choked and it came back up. And he -- he just couldn't get his breath and she beat him in the back and all of this, you know, saying you got choked. And so after a couple times of that, she said, "well, no wonder he's choked, this is going straight into his lungs." . . . . So, she took the tray out and from that point on, he never could drink or eat anything.

Ms. Mullins testified that Mr. Lehman continued to indicate that he was hungry and thirsty throughout his hospitalization, and when she was asked, "Did he ever stop asking for food

or drink," replied, "No, he was always hungry and always wanted to drink." Ms. Mullins also testified regarding the throat-suctioning procedures that Mr. Lehman endured:

> . . . [T]here was suctioning that went on on a regular basis in his throat. And at first, they just -- when he got all choked and everything, they took a big bulb thing with a long thing on it, and went down and suctioned his throat. And then they came in after that and they hooked up a tube above the head of his bed and it had a long -- long tube thing on it. And that's what they used to suction his throat out.
>
> And he would get to where he would choke, he would be like he was strangling and couldn't breathe. And so, they would come in and suction his throat and she would turn that suction on and run that thing down his throat, just like this, and suction his throat out. And he would cough and strangle and choke.
>
> And at one point, he got to where when he would see them coming, he would just start shaking his head and his eyes would get real -- he was so scared. He was like a little child and was so scared. So, I would tell him, "hold my hand and it will be all right, just hold my hand and it will be all right because it will be -- it will be over in a minute." So, he would just squeeze my hand the whole time they were doing it and just choke and cough.

At the conclusion of her testimony, Ms. Mullins was asked whether she "fe[lt] that he suffered much in the hospital," and she testified as follows:

> He -- like I said, he was so scared. It was one incident that happened that was hard for him was my sister and I were there, and he came -- they came in to give him a bath and to change his bed, and they just jerked the covers off of him, and he was a very modest man. So, he was very embarrassed and he was ashamed, and he kept making this motion with his hand and saying something. And I realized -- and he didn't want my sister and I -- he wanted me to leave the room and turn around, turn around. So, it was embarrassing for him to be there, being constrained and have somebody have to change his diapers and all of that, because he -- he would want me to turn around. He would motion for me to turn around when they would do that. And I would give him privacy. So, that was embarrassing for him.
>
> It was hard -- it was hard. He couldn't breath. So, it was hard with the suctioning and all of the medicals things that went on with him. I would not want to go through that for ten days, nor anyone else have to go through that.

Mr. Lehman's medical records, consisting of more than 450 pages, included numerous "Routine Assessment/Reassessment" forms which described in detail Mr.

Lehman's physical and mental health, including his neurological, cardiovascular, respiratory, and gastrointestinal condition. The forms were filled out twice during each day of his hospitalization. The forms state that, throughout his hospitalization, Mr. Lehman's breathing was "labored," "coarse," or "shallow," and that he experienced "frequent" or "occasional" coughing. From March 21 until his death, the forms indicate that he was confined to his bed with wrist restraints and that his mobility was "very limited" or that he was "completely immobile." The forms also state that Mr. Lehman's throat was suctioned on March 21, 22, 25, 26, 27, and 28.[3] Throughout his treatment, the forms consistently state that his bowel pattern was "incontinent" and that he had secretions in his throat and lungs. The assessment forms also included a section indicating whether Mr. Lehman was in pain; this entry was filled out with an "N" on every form. On a few of the forms entries are made describing Mr. Lehman's psychosocial state. The first entry appears on the form for March 23 and states that his mood was "agitated;" the next entries describing his mood appeared on March 28 and 29, and state that Mr. Lehman was "agitated" and "gets angry and agitated at times." The record also contains documents entitled "Additional Clinical Documentation," which state that Mr. Lehman was "confused," "disoriented," and "agitated/hostile" throughout his treatment.

The record shows that Mr. Lehman incurred nearly $70,000 in medical expenses during his 10 day stay in the hospital. His medical records, as well as the testimony of Ms. Mullins and Dr. Silas, demonstrate that throughout his treatment Mr. Lehman was enduring fear, agitation, difficulty breathing, confusion, disorientation, incontinence, repeated throat-suctioning procedures, aspiration, hunger and thirst, and was confined to his bed with wrist restraints. All of these experiences are properly considered "pain and suffering" as defined in *Overstreet*, as physical and mental discomfort, and which includes a "wide array of mental and emotional responses." *Overstreet*, 4 S.W.3d at 715. While portions of Mr. Lehman's medical records indicate that he was not in pain and was, at times, comfortable, the preponderance of the evidence shows that he struggled to survive for nearly all of the 10 days of his hospitalization. The evidence also shows that Mr. Lehman's dementia and other mental health problems made it difficult, if not impossible, for him to comprehend why he was hospitalized and undergoing medical treatment, thereby exacerbating his confusion, agitation, and disorientation. A tortfeasor "must accept the person as he finds him," and Mr. Lehman is entitled to recover for all of the pain and suffering he experienced, including the suffering that was increased by his previous medical conditions. *See Haws v. Bullock*, 592 S.W.2d 588, 591 (Tenn. Ct. App. 1979). The evidence preponderates against the Commission's award for his pain and suffering and the award is beneath the lower limit of

---

[3] It is not clear if whether his throat was suctioned on the other days or if the forms merely do not mention that it occurred.

the range of reasonableness established by the record in this case, giving due consideration to the factors identified in the cases mentioned previously.

CONCLUSION

For the foregoing reasons, the judgment of the Tennessee Claims Commission is affirmed in part and modified in part. Pursuant to our authority to modify the Commission's award, *see Rinehart v. State*, 1994 WL 126803 (Tenn. Ct. App. April 13, 1994), we modify the award of pain and suffering by increasing it to $50,000.00; in all other respects, the judgment is affirmed.

_____
RICHARD H. DINKINS, JUDGE